## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| CARPENTER PENSION FUND OF ILLINOIS and IRON WORKERS LOCAL 11 PENSION FUND, Derivatively and on Behalf of the Nominal Defendant CENTENE CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL F. NEIDORFF, ROBERT K. DITMORE, DAVID L. STEWARD, JOHN R. ROBERTS, TOMMY G. THOMPSON, FREDERICK H. EPPINGER, RICHARD A. GEPHARDT, ORLANDO AYALA, VICKI B. ESCARRA, and JEFFREY A. SCHWANEKE, <br><br> Defendants, <br><br> and <br><br> CENTENE CORPORATION, <br><br> Nominal Defendant. | Civ. Action No. <br><br> JURY TRIAL DEMANDED |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION ............................................................................ 1

II.     JURISDICTION AND VENUE ......................................................................... 9

III.    PARTIES ........................................................................................................... 9
        A.      Plaintiffs ................................................................................................. 9
        B.      Nominal Defendant .............................................................................. 10
        C.      Director Defendants ............................................................................. 10
        D.      Executive Defendants and Former Director Defendants ..................... 14

IV.     CENTENE'S ACQUISITION OF HEALTH NET ......................................... 16
        A.      Background to the Merger and Due Diligence of Health Net ............. 16
        B.      The Board Unanimously Approves the Transaction on July 1, 2015 .................. 23
        C.      The Merger Agreement ........................................................................ 27
        D.      The Joint Proxy Statement ................................................................... 30

V.      DIRECTOR DEFENDANTS FAILED TO DISCLOSE OR INVESTIGATE
        HEALTH NET'S INCREASING LOSSES AND LIABILITIES ................... 34
        A.      Health Net's Mounting Losses on California Policies .......................... 34
        B.      Centene Failed to Disclose Health Net's Mounting Liabilities for
                Substance Abuse Claims ...................................................................... 35
        C.      Centene's Q1 2016 Financial Statements and Form 10-Q ................... 40
        D.      Misrepresentations Made in Centene's April 2016 Form 10-Q............ 41
        E.      Post-Merger Misrepresentations Regarding the Adequacy of Health Net's
                Reserves ............................................................................................... 44
        F.      Centene Concealed Health Net's Potential Billion-Dollar Tax Liability
                Prior to and After the Merger................................................................ 49
        G.      Centene Failed to Adequately Investigate or Disclose Health Net's
                Alleged Involvement in Fraudulently Overcharging the Government ................. 51

VI.     CENTENE ANNOUNCES A $390 MILLION INCREASE IN RESERVES ................. 52

VII.    THE INDIVIDUAL DEFENDANTS' DUTIES AND OBLIGATIONS........................ 59
        A.      Duties of All Individual Defendants ..................................................... 59
        B.      Duties of the Director Defendants on the Audit Committee................. 65
        C.      Reporting Requirements under Generally Accepted Accounting Principles
                and SEC Regulations ........................................................................... 68

VIII.   STOCK SALES BY THE INSIDER SELLING DEFENDANTS ................................... 72

IX.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ....................................... 74

X.   DEMAND FUTILITY ALLEGATIONS ......................................................... 74
   A.   Demand is Futile as to All Director Defendants Because the Director
        Defendants Face A Substantial Likelihood of Liability ....................................... 75
   B.   Defendants Roberts and Eppinger as Audit Committee Members Are Not
        Disinterested as They Face A Substantial Likelihood of Liability ...................... 76
   C.   Additional Allegations of Demand Futility ......................................................... 78

XI.   DAMAGES TO CENTENE ........................................................................ 81

XII.   CLAIMS FOR RELIEF ............................................................................. 83

XIII.   PRAYER FOR RELIEF ........................................................................... 88

XIV.   JURY DEMAND ................................................................................... 89

Plaintiffs Carpenters Pension Fund of Illinois and Iron Workers Local 11 Pension Fund (together "Plaintiffs"), by and through their undersigned counsel, bring this action derivatively on behalf of Nominal Defendant Centene Corporation ("Centene" or the "Company") against certain of its current and former directors and officers ("Individual Defendants"). The allegations below are made upon personal knowledge as to Plaintiffs and their own acts, and upon information and belief as to all other matters, based upon a review of: (a) information publicly disseminated by Centene, including its public filings with the U.S. Securities and Exchange Commission ("SEC"); (b) public filings and other documents related to Health Net Inc. ("Health Net"); (c) news reports, press releases, analysts' reports and other publicly available documents; (d) pleadings and other court documents related to litigation against Centene and/or Health Net; (e) documents filed with state insurance regulators; (f) documents obtained pursuant to a demand made on the Company pursuant to 8 *Del. C.* §220 (the "Demand" and "220 Documents") and (g) multiple admissions made by Centene's senior management.

## I.      SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought on behalf of Nominal Defendant Centene against certain of its directors and officers for violation of the federal securities laws, breaches of fiduciary duties, insider trading and other misconduct. These wrongs resulted in millions of dollars in damages to Centene, in part, from the overpayment for Health Net in the Merger (defined below), sales of stock by insiders, serious harm to its reputation, goodwill and standing in the business community, which have exposed the Company to further potential liability for violations of the federal securities laws, California tax laws, and government regulations.

2.      This derivative action arises out of Centene's $6.8 billion merger with Health Net, through which Centene purchased all of Health Net's outstanding stock (the "Merger").  On July 2, 2015, Centene and Health Net announced that they had agreed to merge.  Centene agreed to

1

exchange 0.622 shares of Centene common stock and $28.25 in cash for each share of Health Net common stock.  Based on Centene's stock price on July 1, 2015, the price paid by Centene for each share of Health Net stock was $78.59.  The transaction, which required stockholder and regulatory approvals, took over eight months to complete and closed on March 24, 2016.

3.     Despite months of due diligence by Centene, and ongoing efforts to integrate Health Net with Centene, the Form S-4 Joint Proxy Statement/Prospectus dated September 21, 2015 ("Joint Proxy"), failed to disclose significant problems acquired with the Health Net business, including:

- Substantial undisclosed liabilities stemming from poorly designed and unprofitable insurance products sold in California – flaws and anticipated liabilities that Centene later admitted were well-known to Centene prior to and at the time of the Merger. Liabilities stemming from those flawed polices, as well as unprofitable business in Arizona, ultimately forced Centene to increase its post-Merger reserves[1] by $390 million, resulting in a loss in market capitalization of over $1 billion;

- Health Net's concerns over claims from substance abuse treatment centers in California and Arizona ███████████████ led to its refusal to pay such claims, the recording of $160 million in additional reserves, and it becoming the subject of numerous lawsuits initiated by treatment centers seeking over $200 million for unpaid claims (the "Treatment Center Actions"), and investigations by the California Department of Insurance ("CDI") and the California Department of Managed Health Care ("DMHC");

- Health Net's undisclosed exposure to nearly *$1 billion* in past unpaid tax liabilities to the State of California, which are the subject of a California taxpayer action styled *Myers v. State Board of Equalization,* No. BS158655 (Cal. Super. Ct. filed Oct. 20, 2015) (the "Tax Litigation") – litigation that was filed against Health Net *before* the vote on the Merger and not disclosed by Centene for over 8 months thereafter despite the fact that the case was considered by a state legislator as "monumental" to California taxpayers;

---

[1] Insurance claims "reserves" are monies that insurance companies earmark for payment of insurance policy claims.  Reserves are generally established by simultaneously recording an income statement expense (which reduces earnings) and a balance sheet liability (which represents a future payment, *i.e.*, negative cash flow).  Under GAAP, a "premium deficiency reserve" is required when there is a probable loss on unearned premiums.

- Health Net's undisclosed exposure to future tax payments of 2.35% on its premiums in California that could substantially reduce Centene's cash flows, profits and margins going forward; and

- Health Net's and Centene's failure to consider the unprofitability of certain insurance products, the insufficiency of reserves, the impact of cessation of payments to substance abuse treatment centers and the potential impact of erroneous tax liability led to materially misleading valuations prepared in connection with the Merger and included in the Joint Proxy sent to investors.

4.    Continuing after the vote on the Merger (October 23, 2015) and through the second quarter of 2016, Defendants continued to conceal Health Net's deteriorating business and made further misstated and omitted material facts as follow:



- Health Net's undisclosed unprofitable policies and related liabilities led to Centene issuing materially false and misleading financial statements to investors in violation of Generally Accepted Accounting Principles ("GAAP");

- As a result of the GAAP violations and Centene's concealment of the inadequacy of its reserves, among other things, the Company is now exposed to potentially massive liability from a securities fraud class action styled *Sanchez v. Centene Corp.*, No. 4:17-cv-00806-AGF (E.D. Mo. filed July 17, 2017) (the "Securities Class Action");

- Health Net's alleged entanglement in a scheme with UnitedHealth Group, Inc. ("UnitedHealth") to defraud the government by submitting false claims for reimbursement to the Centers for Medicare and Medicaid Services ("CMS"), which resulted in the U.S. Department of Justice ("DOJ") issuing two Civil Investigative

Demands ("CID")[2] related to the DOJ's intervention in a federal *qui tam* lawsuit (the "Whistleblower Suit")[3] in which Health Net is named as one of the defendants.

5.      On March 24, 2016, Centene completed the Merger without fully disclosing the ongoing problems facing Health Net's business – problems which should have been disclosed by Centene and its Board, and which would have led to a reduction in the value of Health Net's business and ultimately the price to Centene's stockholders.  Thereafter, the Board continued to conceal the massive problems at Health Net, in violation of its fiduciary duties.  Centene's CEO and other senior management, who regularly reported to the Board, subsequently admitted they had ***prior*** knowledge of the serious problems acquired from Health Net in the Merger.

6.      Defendant Neidorff, Centene's CEO and a director, publicly stated at numerous times that "we" knew the California policies were flawed and unprofitable at the time Centene entered into the Merger, among other things, as described herein. As CEO and a director, Neidorff had a duty to report these matters to the full Board. The repeated admissions by Neidorff (and others) as to Company-wide knowledge of Health Net's problems, coupled with his duty to report material facts to the Board, provides a strong inference that the Defendants knew of these financial issues prior to the Merger.

Nonetheless,

---

[2] On December 15, 2016, Centene disclosed the receipt of a CID from the DOJ concerning the UnitedHealth False Claims Act litigation.  In its Form 10-Q filed on October 24, 2017, Centene revealed that, in October 2017, the DOJ issued another CID regarding potentially fraudulent claims filed by Health Net with the U.S. Department of Veterans Affairs ***beginning in 2014*** – well before the Merger.

[3] The Whistleblower Suit is styled *United States, ex rel. Benjamin Poehling v. UnitedHealth Group, Inc.,*  No. 2:16-cv-08697-MWF-SS  (C.D. Cal. filed Nov. 22, 2016).

Defendant Neidorff and others, continued to not only conceal this information from the public for the next several months, but denied outright, that any issue existed regarding reserves, while later admitting they knew it all along.

7.     Centene's concealment of Health Net's substantial liabilities and business problems has led to a litany of legal actions against the Company, thereby exposing it to massive risks and potential liabilities.  Those actions include: (1) the Securities Class Action, which alleges that Centene issued false and misleading financial statements to investors in violation of GAAP, resulting in a loss of over $1 billion in market capitalization; (2) the Treatment Center Actions, which seek to recover over $200 million in unpaid claims; (3) the California Department of Insurance and California Department of Managed Health Care investigations surrounding Health Net's refusal to pay treatment center claims, which could result in serious penalties and sanctions;[4] (4) the Tax Litigation, which seeks nearly one billion dollars in allegedly unpaid taxes as well as a 2.35% tax on all premiums in California going forward; and (5) Health Net's alleged involvement in a Medicare fraud scheme which resulted in Centene receiving two CIDs from the DOJ relating to the Whistleblower Suit in which Health Net is named as a defendant.

8.     Centene's purported due diligence and its integration with Health Net, as well as regular reports shared with the Director Defendants regarding those efforts, continued for at least nine months.  The Merger also required approval from insurance regulators, including those in California and Arizona, with whom Centene was actively engaged in discussions.  During the due diligence period and up until the Merger closed, Centene repeatedly issued *pro forma* financial statements showing Health Net's assets and liabilities – financial statements that were materially

---

[4] *See* Chad Terhune, *Regulators Probing Whether Health Net is Stiffing Drug Treatment Providers*, California Healthline (May 31, 2016)https://californiahealthline.org/news/regulators-probing-whether-health-net-is-stiffing-drug-treatment-providers/.

false and misleading and which the Director Defendants failed to correct.  Defendants' failure to perform any due diligence on Health Net's reserves resulted in a material understatement of its liabilities in the Joint Proxy.  Internally, management and the Director Defendants ███████ ████████████████████████ had a clear picture of the true nature of Health Net's business despite publicly touting ongoing *successful* integration efforts and adequate reserves.  As reflected in post-Merger statements made by Defendant Michael F. Neidorff ("Neidorff") and other members of senior management who reported directly to the Board, Centene knew of Health Net's unprofitable policies and business prior to the Merger.

9.     Both prior to and after the Merger, the Director Defendants were informed of the serious risks surrounding Health Net's business, its value and reserves.  Specifically, Health Net had experienced dramatic increases in claims on its policies for substance abuse care in California and Arizona, causing its liabilities to increase drastically in 2014 and 2015, and its profitability to accordingly decline. Beginning ████████████████ November 2015 and continuing past March 2016, *when the Merger closed*, Health Net ceased payments to substance abuse treatment centers to curtail policy losses which materially increased its liabilities.

10.     Defendants' prior knowledge of the problems at Health Net and the Board's bad faith are reflected in a series of admissions by Defendant Neidorff and others following the merger. In numerous statements concerning the reserves and related problems, Neidorff admits that the $390 million reserve was for issues "prior" to March 24, 2016, and that **"[t]his is something we inherited.  And it was prior to the 24th [of March] when those things were set."** (Emphasis added).  Neidorff further admitted he knew of Health Net's problems, as he had been working with the insurance department for months on fixing the policy design defects that led to the premium deficiency reserve.  Ultimately, the Director Defendants admitted in Centene's 2016 10-Q that

these liabilities resulted from **"*cost trends existing prior to the acquisition date*."** (Emphasis added).  These admissions (and numerous others detailed below) coupled with the extensive pre-Merger proceedings before the California insurance regulators, and ongoing reports to the Director Defendants concerning the successful integration with Health Net, strongly support an inference that the Board knew of the problems at Health Net and acted in bad faith by allowing the Merger to go forward while ignoring Health Net's worsening financial condition and increasing business risks.

11.    The Director Defendants knew these facts when they issued the Joint Proxy but failed to correct the Company's misstatements.  Although the Merger did not close for more than eight months after the Board approved the Merger Agreement, Director Defendants failed to update the stale due diligence findings, valuation estimates, and disclosures to investors regarding Health Net's increasing business risks.  Regarding Health Net's reserves, the Director Defendants knew that their financial advisors expressly disavowed confirming their adequacy – thereby warranting further scrutiny from the Board prior to the closing of the deal, particularly after they obtained evidence of the policy design flaws, the failing Arizona business and Health Net's failure to pay treatment center claims.

12.    Defendants, in connection with the review and the dissemination of the Joint Proxy and in ultimately approving the Merger, knowingly issued misleading statements regarding Health Net's finances, including revenues, income, and liabilities; failed to disclose significant risks to Health Net's business; and failed to correct such misstatements for months.  Director Defendants had an ongoing duty, up until the Effective Time (*i.e.* March 24, 2016), to ensure that Centene did not overpay for HealthNet.

13. By July 2016, Centene was forced to disclose that Health Net had incurred *$390 million* in liabilities which existed as of the March 24, 2016 Merger date, but which Centene and Health Net had previously concealed. *The increased liabilities were greater than Health Net's entire pre-tax annual earnings as reflected in recent years, making clear that Health Net's earnings and valuations as stated in the Joint Proxy were vastly overstated*. Centene was forced to record these increased liabilities in part because its acquired California and Arizona commercial insurance products were unprofitable.  The lack of profitability forced the Company to seek "price increases and benefit design changes, including reductions in reimbursement for out of network services as the Company paid a higher percentage of its insurance claims."[5] Profitability in Arizona was so poor that Health Net exited certain markets entirely.

14. During this period of time, in breach of their fiduciary duties, the Selling Defendants disposed of over $28 million in Centene common stock while in possession of propriety inside information.  Defendant Neidorff sold nearly $20 million of his personal holdings and, in 2015 and 2016 he received total compensation of approximately $20.75 million and $21.97 million, respectively.

15. In short, by reason of their due diligence failures, misleading statements to stockholders in the Joint Proxy related to the vote on the Merger, and concealment of material deficiencies in Health Net's finances and business for months following the Merger, the Defendants caused Centene to buy Health Net at a highly inflated price.  Defendants' failures are evidenced, in part, by the need for Centene to record $390 million in previously unaccounted-for reserves, and a loss of over $1 billion in stockholder value when the Company, on July 26, 2016, belatedly disclosed the truth concerning the additional reserves.  Not surprisingly, numerous

---

[5] Centene Corp., Current Report (Form 8-k) (July 26, 2016).

analysts questioned the Company's credibility, further harming Centene by eliminating goodwill and trust in the Company's executives.

## II.     JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1331 for the claims asserted herein for violations of section 14(a) of the Exchange Act. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.  In connection with the acts, conduct and other wrongs complained of herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, the United States and the facilitation of a national securities market.

17.     This Court has jurisdiction over each defendant named herein, because each defendant is either an individual or corporation that has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.  In addition, Nominal Defendant Centene conducts business in and maintains operations in this District.

18.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because (i) Centene maintains its principal place of business in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have engaged in numerous activities that had an effect in this District.

## III.     PARTIES

### A.     Plaintiffs

19.     Plaintiff Carpenters Pension Fund of Illinois ("Illinois Carpenters") is a Centene stockholder and has continuously held Centene stock throughout the relevant period and continues

to hold Centene stock.  Illinois Carpenters will fairly and adequately represent Centene's interests in this action.

20.     Plaintiff Iron Workers Local 11 Pension Fund ("Iron Workers") is a Centene stockholder and has continuously held Centene stock throughout the relevant period and continues to hold Centene stock.  Iron Workers will fairly and adequately represent Centene's interests in this action.

### B.     Nominal Defendant

21.     Nominal Defendant Centene Corporation is a Delaware Corporation headquartered at 7700 Forsyth Boulevard, St. Louis, Missouri 63105.  Centene sells health insurance policies in the United States including policies for Medicaid, Medicare Advantage, Medi-Cal, and other products.

### C.     Director Defendants

22.     Defendant Michael F. Neidorff ("Neidorff") is and has been a Centene director, President, and CEO of Centene since May 1996. Neidorff also began serving as the Chairman of the Board starting in May 2004. Defendant Neidorff was named as a defendant in the Securities Action.  Defendant Neidorff knowingly, recklessly, or with gross negligence made materially misleading statements in Centene's press releases and public filings concerning Health Net's business practices and finances, and as a result he is named as a defendant in the Securities Action. Furthermore, Defendant Neidorff made materially misleading statements in the Joint Proxy. Between December 10, 2015 and December 31, 2015, while in possession of material, nonpublic information concerning Centene's true business and finances, Defendant Neidorff disposed of 367,427 shares of his stock for $19,950,436.04 in proceeds.  Centene paid Defendant Neidorff $21,968,983 in total compensation in 2016, and $20,755,103 in total compensation in 2015.

23.     Defendant Robert K. Ditmore ("Ditmore") is and has been a Centene director since 1996. Ditmore is the current "presiding director" of the Board.  Ditmore is a retired Director, President, and Chief Operating Officer of United Healthcare Corporation (now known as UnitedHealth Group, Inc.).  Ditmore has been Chairman of the Compensation Committee and a member of the Nominating and Governance Committee since at least 2006.  Defendant Ditmore knowingly or recklessly approved the materially misleading statements in Centene's press releases and public filings concerning Health Net's business practices and finances, while also permitting Health Net, when it was under the control of Centene, to refuse to pay amounts that it owed to substance abuse facilities.  Further, Defendant Ditmore made materially misleading statements in the Joint Proxy.  Centene paid Defendant Ditmore $385,295 in total compensation in 2016, and $380,289 in total compensation in 2015.

24.     Defendant David L. Steward ("Steward") is and has been a Centene director since May 2003.  Steward is the founder and chairman of Worldwide Technology, Inc.  Steward has been Chairman of the Nominating and Governance Committee and a member of the Compensation Committee since at least 2006.  Defendant Steward knowingly or recklessly approved the materially misleading statements in Centene's press releases and public filings concerning Health Net's business practices and finances, while also permitting Health Net, when it was under the control of Centene, to refuse to pay amounts that it owed substance abuse facilities.  Further, Defendant Steward made materially misleading statements in the Joint Proxy.  Centene paid Defendant Steward $355,295 in total compensation in 2016, and $375,289 in total compensation in 2015.

25.     Defendant John R. Roberts ("Roberts") is and has been a Centene director since March 2004.  Roberts is a retired Managing Partner of Arthur Anderson LLP.  Roberts previously

served as Chairman of the Audit Committee for Regions Financial Corporation and for Energizer Holdings, Inc.  Roberts has been Chairman of Centene's Audit Committee since at least 2006. Defendant Roberts knowingly or recklessly approved the materially misleading statements in Centene's press releases and public filings concerning Health Net's business practices and finances, while also permitting Health Net, when it was under the control of Centene, to continue refusing to pay amounts that it owed to substance abuse facilities.  Further, Defendant Roberts made materially misleading statements in the Joint Proxy.  Centene paid Defendant Roberts $395,295 in total compensation in 2016, and $390,289 in total compensation in 2015.

26.     Defendant Tommy G. Thompson ("Thompson") is and has been a Centene director since April 2005.  Thompson previously served as President of Logistics Health, Inc. from 2005 to 2011, and as secretary of the U.S. Department of Health & Human Services from 1987 to 2001. He also serves as a director for Therapeutics MD Inc., Physicians Realty Trust and United Therapeutics Corp. Thompson has also previously served as a director for C.R. Band, Inc., AGA Medical Corp. and Cancer Genetics.  Thompson has been a member of the Compensation Committee since at least 2011 and was a member of the Nominating and Governance Committees from at least 2012 to 2017.  Defendant Thompson knowingly or recklessly approved the materially misleading statements in Centene's press releases and public filings concerning Health Net's business practices and finances, while also permitting Health Net, when it was under the control of Centene, to refuse to pay amounts that it owed substance abuse facilities.  Further, Defendant Thompson made materially misleading statements in the Joint Proxy.  Centene paid Defendant Thompson $380,295 in total compensation in 2016, and $360,289 in total compensation in 2015.

27.     Defendant Frederick H. Eppinger ("Eppinger") is and has been a Centene director since April 2006. Eppinger is a retired director, President and Chief Executive Officer of The

Hanover Insurance Group, Inc.  Eppinger also serves as a director for Stewart Information Services Corp.  Eppinger has been a member of Centene's Audit Committee since at least 2007 Defendant Eppinger knowingly or recklessly approved the materially misleading statements in Centene's press releases and public filings concerning Health Net's business practices and finances while also permitting Health Net, when it was under the control of Centene, to refuse to pay amounts that it owed substance abuse facilities.  Further, Defendant Eppinger made materially misleading statements in the Joint Proxy.  Centene paid Defendant Eppinger $365,295 in total compensation in 2016, and $360,289 in total compensation in 2015.

28.     Defendant Richard A. Gephardt ("Gephardt") is President and CEO of Gephardt Group, LLC and has been a Centene director since December 2006.  Gephardt also serves as a director of Spirit Aerosystems Holdings, Inc.  Gephardt currently serves on the Compensation Committee.  Defendant Gephardt knowingly or recklessly approved the materially misleading statements in Centene's press releases and public filings concerning Health Net's business practices and finances, while also permitting Health Net, when it was under the control of Centene, to refuse to pay amounts that it owed.  Further, Defendant Gephardt made materially misleading statements in the Joint Proxy.  While in possession of material, nonpublic information concerning Centene's true business health, Defendant Gephardt disposed of 16,910 shares of his stock for $1,096,058.20 in proceeds.  Centene paid Defendant Gephardt $380,295 in total compensation in 2016, and $365,565 in total compensation in 2015.

29.     Defendant Orlando Ayala ("Ayala") is and has been a Centene director since September 2011.  Prior to 2016, Ayala was Chairman and Corporate Vice President of Emerging Business for Microsoft Corp.  Ayala has been a member of the Compensation Committee since at least 2012.  Defendant Ayala knowingly or recklessly approved the materially misleading

statements in Centene's press releases and public filings concerning Health Net's business practices and finances, while also permitting Health Net, when it was under the control of Centene, to refuse to pay amounts that it owed.  Further, Defendant Ayala made materially misleading statements in the Joint Proxy.  Centene paid Defendant Ayala $330,295 in total compensation in 2016, and $325,289 in total compensation in 2015.

30.     The Director Defendants named in ¶¶ 22-29 constitute all of the current directors of the Company, except for non-defendant director Jessica L. Blume, who was elected to serve on the Company's Board on February 5, 2018.  The Board has been highly insulated from potential challenges as reflected in its composition – seven of Centene's directors have served for at **least twelve consecutive years.**  Further contributing to Board stagnation is the division of directors' terms into three classes thereby preventing any significant annual turnover of the Board or the ability for stockholders to mount an effective proxy contest.  Reflecting further the absence of independent oversight on the Board at the Committee level, each of Centene's Committees has had the same chairperson for *no less than twelve years*.

31.     In 2015 Centene's Audit Committee met six times and in 2016 it met four times. The Audit Committee was responsible for ensuring the integrity of the Company's financial statements including the adequacy of its reserves.  During 2015 the Audit Committee was comprised of Defendants Roberts, Eppinger and Pamela A. Joseph, who is not a defendant in this case.  In 2016, Defendant Escarra, a former Health Net director, replaced Joseph on the Audit Committee.

32.     During the same period, Centene's Compensation Committee met five times per year and its Nominating and Governance Committee met once per year.

**D.     Executive Defendants and Former Director Defendants**

33.     Defendant Vicki B. Escarra ("Escarra") served as a director of Health Net from July 2006 to the date the Merger closed, March 24, 2016, and became a Centene director pursuant to the terms of the Merger Agreement.  Escarra remained a Centene director from March 2016 to March 2017 and served on the Audit Committee.  Escarra informed Centene on March 1, 2017 that continued service on the Board would "unduly interfere with a business opportunity," and decided not to stand for reelection at the Company's 2017 annual meeting of stockholders.  As a Health Net Board member prior to the Merger, Escarra had knowledge of Health Net's undisclosed financial problems and risks to its business, as described herein.  Defendant Escarra knowingly or recklessly approved the materially misleading statements in Centene's press releases and public filings concerning Health Net's business practices and finances, while also permitting Health Net, when it was under the control of Centene, to refuse to pay amounts that it owed substance abuse facilities.  Centene paid Defendant Escarra $733,272 in total compensation in 2016.

34.     Defendant Jeffrey A. Schwaneke ("Schwaneke") was Centene's Chief Accounting Officer, Corporate Controller, and Senior Vice President. On March 24, 2016, Schwaneke was appointed Centene's Chief Financial Officer, Executive Vice President, and Treasurer.  Defendant Schwaneke was named as a defendant in the Securities Action.  Defendant Schwaneke knowingly or recklessly made materially misleading statements in Centene's press releases and public filings concerning Health Net's business practices and finances, and as a result he is named as a defendant in the Securities Action.  While in possession of material, nonpublic information concerning Centene's true business and finances, Defendant Schwaneke disposed of 7,450 shares of his stock for $422,815.52 in proceeds.   Centene paid Defendant Schwaneke $4,325,029 in total compensation in 2016.

35.     Defendant Carol E. Goldman ("Goldman") was Centene's Executive Vice President and Chief Administrative Officer from June 2007 to at least April 2017.  While in possession of material, nonpublic information concerning Centene's true business health, Defendant Goldman disposed of 69,807 shares of her stock for $4,272,759.98 in proceeds.  In 2015, Centene paid Defendant Goldman a total of $4,218,776 in compensation.

36.     Defendant K. Rone Baldwin ("Baldwin") was Centene's Executive Vice President, Markets from January 2016 to December 2016 and Executive Vice President, Insurance Group Business Unit from December 2012 to January 2016.  While in possession of material, nonpublic information concerning Centene's true business health, Defendant Baldwin disposed of 37,858 shares of his stock for $2,318,253.72 in proceeds.  In 2015, Centene paid Defendant Baldwin a total of $4,158,259 in compensation.

37.     Defendants Neidorff, Ditmore, Eppinger, Gephardt, Ayala, Roberts, Thompson, and Steward are the "Proxy Defendants," as these Defendants reviewed, approved and signed the Joint Proxy.

38.     Defendants Neidorff, Gephardt, Schwaneke, Goldman, and Baldwin are the "Selling Defendants."

## IV.     CENTENE'S ACQUISITION OF HEALTH NET

### A.     Background to the Merger and Due Diligence of Health Net

39.     Before its acquisition by Centene, Health Net sold health insurance policies to individuals, families, and businesses. As of December 31, 2015, Health Net provided and administered health benefits to approximately 6.1 million individuals in the United States. Health Net also offered behavioral health, substance abuse and employee assistance programs, as well as plans for the provision of prescription drugs. Health Net's business was concentrated in the

Western U.S. with a significant presence in California, where it served approximately 3.2 million customers in California and had premium revenues of $13.4 billion as of December 31, 2014.

40.     As of 2014, the Affordable Care Act ("ACA") imposed "essential health benefit" requirements on health insurance policies, including those sold by Health Net. By calendar year 2014, most individual and small group health insurance plans, as well as Medicaid benefit plans, were required to cover "essential health benefits," including mental health and substance abuse services. Substance abuse benefits were one of 10 categories of benefits as defined under the new law. *See* 42 U.S.C. §18022 (2014).

41.     In 2014 and 2015, Health Net experienced dramatic increases in claims for substance abuse-related treatments on its EPO ("exclusive provider organization") and PPO ("preferred provider organization") individual health insurance policies in California (the "California Policies"), rendering these policies increasingly unprofitable. In 2014, Health Net earned $232 million in premiums on the California Policies, but incurred approximately $352 million in claims on those policies – a loss of $120 million. In 2015, Health Net earned $189 million in premiums, but incurred over $475 million in claims – a loss of $286 million.

42.     As Centene later disclosed in connection with Health Net's application to California for rate plan modifications in May 2016, "spending for drug testing and substance abuse facilities [for Health Net] PPO plans saw a 6,359 percent increase year-over-year from 2013 to 2014 (with 2014 reflecting the first year of full ACA market reform implementation), and a 2,674 percent increase in year-over-year spending from 2014 to 2015."[6]  The application further revealed that Health Net's elevated recorded substance abuse claims on its California Policies were consistently high throughout 2015:

---

[6] Health Net, HAO-2016-0086 Data Request (2016).

| Month | Members | Medical Claims (non-Substance Abuse) | | | Substance Abuse Claims | | | Pharmacy Claims | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Paid | Yr over Yr Paid Trend | | Paid | Yr over Yr Paid Trend | | Paid | Yr over Yr Paid Trend | |
| Jan-15 | 35,653 | 554.19 | 19.3% | | 102.75 | 777.4% | | 83.04 | 116.0% | |
| Feb-15 | 35,927 | 508.01 | 9.7% | | 156.75 | 1089.4% | | 81.51 | 90.5% | |
| Mar-15 | 38,239 | 559.37 | 20.9% | | 314.81 | 1400.3% | | 87.32 | 81.3% | |
| Apr-15 | 37,546 | 502.14 | 16.5% | | 291.79 | 1500.5% | | 96.67 | 62.8% | |
| May-15 | 37,214 | 515.94 | 17.6% | | 270.38 | 1219.0% | | 94.02 | 64.2% | |
| Jun-15 | 37,004 | 540.70 | 14.0% | | 280.03 | 1180.8% | | 106.01 | 70.7% | |
| Jul-15 | 36,912 | 509.75 | 10.5% | | 389.75 | 1532.1% | | 116.58 | 85.4% | |
| Aug-15 | 36,929 | 469.44 | 3.1% | | 463.59 | 2113.8% | | 108.74 | 82.8% | |
| Sep-15 | 36,810 | 545.60 | 21.9% | | 626.69 | 2471.4% | | 108.93 | 71.3% | |
| Oct-15 | 36,508 | 593.12 | 30.4% | | 1,003.15 | 2785.1% | | 107.49 | 47.9% | |
| Nov-15 | 36,548 | 521.78 | 28.0% | | 935.35 | 1644.5% | | 103.60 | 48.4% | |
| Dec-15 | 36,188 | 532.99 | 12.3% | | 826.04 | 1345.9% | | 118.15 | 35.1% | |
| CY 2014 | 638,521 | 452.14 | | | 28.09 | | | 62.33 | | |
| CY 2015 | 441,478 | 529.38 | 17.1% | | 471.12 | 1577.4% | | 101.01 | 62.1% | |

During this same period, Health Net also incurred dramatically increasing substance abuse- related claims on its health insurance policies in Arizona. (*See e.g.* ¶ 121)

43.     Given the due diligence and ongoing integration efforts that commenced prior to the issuance of the Proxy, and ███████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ █████████████████████████

44.     According to the Joint Proxy, Centene and Health Net began discussing a potential business combination in November 2014 when Defendant Neidorff contacted Health Net's CEO, Jay Gellert ("Gellert"), to discuss the "complementary aspects of their respective businesses." Neidorff and Gellert continued their dialogue and, on March 2, 2015, they and other high-level executives at both companies met in St. Louis to discuss a possible transaction.

45.     Between March 2015 and the end of May 2015, Defendant Neidorff spoke to Gellert on several occasions by telephone. On June 8, 2015, Neidorff, Gellert, and other

representatives from the companies met.  Neidorff informed the Health Net representatives that Centene was interested in pursuing a transaction.

46.     At a Board meeting on June 13, 2015, Gellert informed the Health Net board that Centene had expressed interest in beginning due diligence to evaluate Health Net's business and a potential business combination.  The Health Net board authorized the commencement of due diligence.

47.     On June 16, 2015, the Centene Board met telephonically.  The Parties also executed non-disclosure agreements.  Neidorff advised Centene's Board that due diligence meetings had commenced that day, and that Centene had engaged McKinsey & Company ("McKinsey"), Evercore Group LLC ("Evercore"), and Allen & Company LLC ("Allen & Co.") as financial advisors on the deal.  Neidorff further advised the Board that Centene's management and representatives from these firms participated in the due diligence.

48.     During the merger negotiations that followed, Evercore and Allen & Co. provided to Centene executives business and financial analyses of Health Net and an analysis of the potential *pro forma* financial impact of the proposed transaction on Centene. Significantly, and as discussed *infra* ¶¶ 57-60, both Evercore and Allen & Co. qualified their opinions by noting that the Board had specifically instructed and given its consent for these firms to use financial forecasts, estimates, and other data directly from Centene management, and specifically that Centene had made certain "adjustments" to the data relating to Health Net.  Neither firm gave an opinion on the accuracy or credibility of such data.  Allen & Co. specifically <u>did</u> <u>not</u> perform "any analysis of the adequacy of reserves for losses or other matters and  . . .  assumed that each of Centene and Health Net has, and the pro forma combined Company will have, adequate reserves for losses and other

matters."[7] ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

49.     At a meeting on June 23, 2015, Neidorff updated the Board on his discussions with

Gellert, as well as other discussions between Centene and Health Net regarding the due diligence,

financial and other business matters relevant to the transaction.   As Centene's Joint Proxy

describes:

> The Centene Board then reviewed the key tasks completed on the potential
> transaction with Health Net during the week ended June 21 and ***discussed the
> ongoing due diligence process and findings then to date regarding synergies
> and financial, operational and legal matters concerning different aspects of
> Health Net's various businesses. The Centene Board then discussed the review
> conducted of Health Net's projections***, the work performed by McKinsey, and
> a detailed analysis of Health Net's technology and IT and the current and pending
> contracts with Cognizant.  ***The Centene Board further discussed, among other
> things, Health Net's government contracts business, Health Net's
> management and regional leadership, Health Net's projections, regulatory
> considerations concerning a potential transaction***, and the potential impact on
> Health Net's business and operations of the pending decision of the U.S.
> Supreme Court in *King v. Burwell* regarding the ACA.
>
> ***Centene's financial advisors then discussed with the Centene Board a business
> and financial overview of Health Net and the potential pro forma financial
> impact of the proposed transaction on Centene based on Centene
> management's preliminary synergy estimates and, in the case of Health Net,
> the adjusted Health Net case***, as well as a preliminary overview of implied
> transaction metrics at various illustrative purchase prices.  Centene's financial
> advisors also discussed an overview of the proposed consideration, consisting of
> a mix of stock and cash, and potential financing plans for the proposed
> transaction.

(Emphasis added).

---

[7] Health Net, Inc., Joint Proxy Statement *DEFM 14A) (Sept. 21, 2015).

50.    On June 23, 2015, Health Net executives attended due diligence meetings at Centene's corporate headquarters.   Defendant Neidorff and Gellert continued to discuss the transaction. The companies continued their due diligence with conference calls and by exchanging documents through July 1, 2015.

51.    On June 30, 2015, Centene's Board held an in-person meeting in St. Louis. According to Centene's Joint Proxy:

> Mr. Neidorff provided an update on the potential transaction with Health Net and discussions with Health Net, including a summary of meetings and communications with Mr. Gellert and other discussions between the two companies and their respective representatives. In addition, Mr. Neidorff and representatives of Skadden discussed the status of negotiations with Health Net on certain material terms of the potential transaction, including with respect to Centene's obligations to obtain requisite regulatory approvals, the circumstances and amount of potential termination fees and the status of the contemplated financing plans related to the potential transaction. The Centene Board also reviewed the strategic rationale for the potential transaction.
>
> Members of Centene's management then discussed strategic considerations in proceeding with the potential transaction and reviewed the status of Centene's due diligence review. Centene's management further discussed PricewaterhouseCoopers' review of Health Net's public financial statements, tax papers and quality of earnings analysis, as well as IT and HR related matters. The Centene Board and Centene's management, together with Centene's advisors, continued to discuss potential synergies arising from the potential transaction and the likelihood of Centene achieving such synergies.
>
> * * *
>
> Mr. Neidorff noted that a request had been made by Health Net to add current members of the Health Net Board to the Centene Board following completion of a potential transaction with Health Net and that Centene had proposed one board seat to Health Net as part of the negotiations. The directors discussed the possibility of expanding the existing Centene Board. Following this discussion, representatives of Skadden reviewed with the Centene Board the fiduciary duties of the directors under Delaware law.
>
> * * *
>
> **Centene's financial advisors then reviewed with the Centene Board financial aspects of the potential transaction, including, without limitation, a summary of financial terms of the potential transaction and implied equity and enterprise values for Health Net based on the proposed purchase price, as well**

21

*as implied purchase price multiples and premiums.* During the course of these discussions, Centene's financial advisors also summarized Centene's and Health Net's historical relative stock price performance, provided an overview of selected companies and selected precedent transactions in the managed care industry, implied premiums paid in selected transactions and *the discounted cash flows of Health Net and Centene based on the adjusted Health Net case and the Centene management forecast, respectively*. The Centene Board additionally discussed with Centene's management and its financial advisors potential synergies related to the potential transaction. After further discussion, the Centene Board instructed Centene's management to continue negotiations of the proposed price and other terms of a transaction with Health Net.

(Emphasis added).



These valuations did not reflect the problems in Health Net's business that ultimately led to a $390 million premium deficiency reserve as described below. (¶¶ 117-131).

**B.     The Board Unanimously Approves the Transaction on July 1, 2015**

54.     On July 1, 2015, the Centene Board unanimously approved the terms of the Merger Agreement and related transactions. The Company's Joint Proxy expressly states that the Board considered the following pertinent factors in making its determination focusing, in large part, on the benefits obtained from Health Net's business in California and the Western U.S.:

- The review of Centene's and Health Net's business, strategy, current and projected financial condition, current earnings and earnings prospects, and the current and prospective regulatory environment;

- The combination of Health Net and Centene would maintain and enhance Health Net's ***strong commercial business in California***, which could also serve as a model for other states in which similar opportunities can be identified;

- Both Centene and Health Net were leading companies in responding to the ACA and building low cost, high quality solutions for the future and, although they have common business lines and focus on the ACA, there is little overlap in their service areas, allowing for the opportunity to expand the reach of their low cost, high quality solutions by geography and product line;

- A review of the potential strategic and financial benefits associated with the transaction, including…[t]he addition of incremental scale in the western United States, including through Health Net's complementary network, which Centene believes will provide it with a stronger presence to compete more effectively in the Medi-Cal market and other Medicaid and Medicare markets, including in Arizona, Oregon and Washington;

- Greater participation in California's dual eligible demonstration program given Health Net's leading share in this market; [and]

- The fact that Centene's management team and legal and financial advisors were involved throughout the negotiations and updated the Centene Board which provided additional perspectives on the negotiations.

(Emphasis added).

55.     The Joint Proxy likewise listed the following potential risks as factors that the Board specifically reviewed in making its determination:

- Certain risks inherent in Health Net's business and operations, including those identified in Health Net's SEC filings;

- The general risks of market conditions that could affect the price of Centene and Health Net common stock, as well as the other risks and uncertainties discussed in Health Net's public filings with the SEC; [and]

- The fact that certain senior executives of Health Net would receive substantial payments in connection with the merger, and that Health Net may also be obligated to make gross-up payments to those executives for the amount of certain taxes resulting from some of these payments.

56.     The Joint Proxy did not disclose risks or trends known to the Defendants related to Health Net's poorly designed policies, the failing Arizona business, its refusal to pay substance abuse claims, and the California tax liabilities.

57.     At this meeting, the Board received a copy of the draft merger agreement, along with a summary of material terms.  Also, Allen & Co. provided its written opinion regarding the fairness of the Merger.  Allen & Co.'s opinion was attached and incorporated by reference into the Joint Proxy.  Allen & Co. stated that it had, *inter alia*:

- reviewed the financial terms and conditions of the merger as reflected in a draft, dated July 1, 2015, of the merger agreement;

- reviewed certain publicly available historical business and financial information relating to Centene and Health Net, including public filings of Centene and Health Net, and historical market prices and trading volumes for Centene common stock and Health Net common stock;

- reviewed certain financial information relating to Centene and Health Net, including certain internal financial forecasts, estimates and other financial and operating data of Centene and Health Net provided to or discussed with Allen & Company by the respective managements of Centene and Health Net **(as adjusted, in the case of the Health Net forecasts, estimates and other financial and operating data, by the management of Centene)**; [and]

- held discussions with the managements of Centene and Health Net relating to the past and current operations and financial condition and prospects of Centene and Health Net.

(Emphasis added).

58.     Allen & Co.'s July 1, 2015 letter to the Board containing its opinion on the Merger,

Allen & Co. set forth the following regarding the limitations of its opinion:

> Our opinion as expressed herein reflects and gives effect to our general familiarity with Centene as well as information which we received during the course of this assignment, including information provided by the managements of Centene and Health Net in the course of discussions relating to the Transaction as more fully described below. In arriving at our opinion, we neither conducted a physical inspection of the properties or facilities of Centene, Health Net or any other entity nor made or obtained any evaluations or appraisals of the assets or liabilities (contingent, off-balance sheet or otherwise) of Centene, Health Net or any other entity, or conducted any analysis concerning the solvency or fair value of Centene, Health Net or any other entity. ***We are not actuaries and our services did not include any actuarial determination or evaluation by us, any attempt to evaluate actuarial assumptions or allowances for losses with respect thereto or any analysis of the adequacy of reserves for losses or other matter and, accordingly, we have assumed that each of Centene and Health Net has, and the pro forma combined company will have, adequate reserves for losses and other matters***.
>
>                           \* \* \*
>
> ***In rendering our opinion, we have relied upon and assumed, with your consent and without independent verification, the accuracy and completeness of all of the financial, legal, regulatory, tax, accounting and other information available to us from public sources, provided to or discussed with us by Centene and Health Net or their respective representatives or otherwise reviewed by us. With respect to the financial forecasts, estimates and other information and data relating to Centene and the potential cost savings anticipated by the management of Centene to result from the Transaction that were directed to utilize in our analyses, we have been advised by the management of Centene and we have assumed, with your consent, that such forecasts, estimates and other financial and operating data have been reasonably prepared in good faith reflecting the best currently available estimates and judgments of such management as to the future financial and operating performance of Centene, such cost savings and the other matters covered thereby***. With respect to the financial forecasts, estimates and other information and data (as adjusted by the management of Centene) relating to Health Net that we were directed to utilize in our analyses, we have been advised by the managements of Health Net and

Centene and we have assumed, with your consent, that such forecasts, estimates and other financial and operating data have been reasonably prepared in good faith reflecting the best currently available estimates and judgments of such managements, as the case may be, as to the future financial and operating performance of Health Net and the other matters covered thereby. We assume no responsibility for and express no view or opinion as to any such financial forecasts, estimates and other financial and operating data or the assumptions on which they are based. We have relied, at your direction, upon the assessments of the managements of Centene and Health Net as to among other things, (i) the potential impact on Centene and Health Net of certain market and other trends in and prospects for, and governmental, regulatory and legislative policies and matters relating to or affecting, the managed care and specialty services sectors of the healthcare industry, including with respect to government subsidized healthcare programs and reimbursement, (ii) existing and future relationships, agreements and arrangements with, and the ability to attract and retain, key employees and commercial relationships with hospitals, physicians and other healthcare providers, (iii) the technology and intellectual property of Centene and Health Net and (iv) the ability to integrate the business of Centene and Health Net. ***We have assumed, with your consent, that there will be no developments with respect to any such matters that would have an adverse effect on Centene, Health Net or the Transaction*** (including the contemplated benefits thereof) or that otherwise would be meaningful in any respect to our analyses or opinion.

\* \* \*

Our opinion is limited to the fairness, from a financial point of view and as of the date hereof, to Centene of the Merger Consideration . . .

(Emphasis added).

59.    Evercore also presented to Centene's Board at the July 1, 2015 meeting and provided a written opinion.  Evercore's opinion was also attached and incorporated by reference into Centene's Joint Proxy Statement.  Evercore stated that it had, *inter alia*:

- reviewed the Centene management forecast, the Health Net management forecast, ***the adjusted Health Net case and the pro forma combined company forecast…***;

- discussed the past and current operations, financial projections and current financial condition of each of Centene and Health Net with their respective managements; and

- considered the potential pro forma impact of the merger on Centene, based on inputs and analysis provided by Centene management.

26

(Emphasis added).

60.     Evercore also submitted a July 1, 2015 letter to the Board in connection with its opinion on the merger stating the following limitations regarding its opinion:

> For purposes of our analysis and opinion, we have assumed and relied upon, without undertaking any independent verification of, the accuracy and completeness of all of the information publicly available, and all of the information supplied or otherwise made available to, discussed with, or reviewed by us, and we assume no liability therefor. ***With respect to the projected financial data relating to Centene and Health Net referred to above, we have assumed that they have been reasonably prepared on bases reflecting the best currently available estimates and good faith judgments of the respective managements of Centene and Health Net as to the future financial performance of the companies under the assumptions reflected therein. We express no view as to any projected financial data relating to Centene or Health Net or the assumptions on which they are based***. We have relied, at your direction, without independent verification, upon the assessments of the management of Centene as to the Estimated Synergies.

* * *

> **We have not made nor assumed any responsibility for making any independent valuation or appraisal of the assets or liabilities of Centene or Health Net, nor have we been furnished with any such appraisals, nor have we evaluated the** solvency or fair value of Centene or Health Net under any state or federal laws relating to bankruptcy, insolvency or similar matters. Our opinion is necessarily based upon information made available to us as of the date hereof and financial, economic, market and other conditions as they exist and as can be evaluated on the date hereof. It is understood that subsequent developments may affect this opinion and that we do not have any obligation to update, revise or reaffirm this opinion.

> We have not been asked to pass upon, and express no opinion with respect to, any matter other than the fairness, from a financial point of view, of the Merger Consideration to Centene.

(Emphasis added).

## C.     The Merger Agreement

61.     Centene and Health Net entered into an agreement and plan of merger on July 2, 2015 (the "Merger Agreement"). Before the market opened on July 2, 2015, Centene and Health

Net jointly announced that the boards of both companies had unanimously approved the Merger and that Centene would acquire Health Net for $78.57 per share for Health Net, a premium of approximately 21% over Health Net's closing stock price on July 1, 2015, and of 26% on June 1, 2015.  As reflected in the press release the Merger Agreement provided that a number of conditions had to be satisfied prior to the closing, including receipt of all regulatory approvals.

62.     In explaining Centene's rationale for the transaction, Neidorff stressed the importance of Health Net's California business by stating: "Health Net's presence in California and other key western states is complementary to our offerings, allowing us to bring additional innovative solutions to the healthcare market."  He also emphasized as a "strategic benefit" that "[t]he transaction will provide Centene with access to California's dual demonstration program and expansion in other Medicaid and Medicare programs in the Western United States, including Arizona, Oregon and Washington."[8]

63.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

64.     On a July 2, 2015 conference call with analysts, Neidorff further stated, "we know Health Net well and we respect their team and their accomplishments."  Neidorff justified the Merger by stating that "[i]mportantly, combining with Health Net is expected to increase and enhance our presence in the California Medicaid Program . . . ."  Neidorff emphasized that

---

[8] *Centene to Combine with Health Net in Transaction Valued at Approximately $6.8 Billion,* PR Newswire (July 2, 2017, 7:08 AM), https://www.prnewswire.com/news-releases/centene-to-combine-with-health-net-in-transaction-valued-at-approximately-68-billion-300108184.html.

"Centene maintains a disciplined approach to M&A" and that "first and foremost" the Merger had to "meet [Centene's] financial criteria."

65.     Health Net's business in California clearly was the main motivation for Centene to enter into the Merger.  In a PowerPoint presentation dated July 15, 2015, Centene identified Health Net's "deeper penetration in California" as the first "growth driver[]" of the Merger.  The presentation further stated that the Merger was expected to be "greater than 20% accretive to Adjusted EPS in first full year." The Company repeated these statements on September 9, 2015 and November 10, 2015.  Due diligence continued for months while Centene sought regulatory approval in California and elsewhere.

66.     ███████████████████████████████████

████████████████████████████████████████████

███████████████████████████    ██████████████████████

██████████████████████████████



**D.    The Joint Proxy Statement**

67.    On August 19, 2015, Centene filed the Form S-4 Preliminary Joint Proxy Statement with the SEC regarding the proposed merger.  Centene filed the final Joint Proxy statement on September 21, 2015 for the special meeting of stockholders to vote on the Merger.  It was signed by Director Defendants Neidorff, Ayala, Ditmore, Eppinger, Gephardt, Roberts, Steward, Thompson, and Selling Defendant Schwaneke. The Joint Proxy was mailed to stockholders and specified the Board's reasons for unanimously approving the Merger (*see* ¶ 52), including that the Merger "would maintain and enhance Health Net's strong commercial business in California, which could also serve as a model for other states in which similar opportunities can be identified." The Joint Proxy added that "Centene's management team and legal and financial advisors were involved throughout the negotiations and updated the Centene Board which provided additional perspectives on the negotiations."

68.     Centene stated that it was making progress on its integration of the Health Net and Centene businesses. On September 9, 2015, Centene presented at the Wells Fargo Healthcare Conference in Boston, Massachusetts. During the presentation, Defendant Neidorff stated that Centene was "look[ing] at some of the upside" of the merger "as we go through the integration, and that's going incredibly well – working very well." ***Neidorff stated that "Health Net will give us great penetration in California, that Health Net would contribute to Centene's growth in the short term, and that I said at the time we did this deal, we have good visibility into 2016, we have pretty good visibility into 2017." Neidorff reiterated that, regarding Health Net's financials, we "have good visibility on 2016."*** (Emphasis added).

69.     On October 23, 2015, Centene's stockholders voted to approve the Merger based on materially false and misleading information contained in the Joint Proxy. As detailed below, the Joint Proxy failed to disclose (i) the existing problems regarding claims from Health Net's substance abuse facilities; (ii) poorly designed and unprofitable policies in California and Arizona; (iii) potentially massive tax liabilities in California; and (iv) Health Net's purported involvement in a scheme to defraud Medicare.

70.     On October 27, 2015, during a quarterly investor conference call, Defendant Neidorff reassured Centene investors regarding the integration with Health Net. Responding to a question from analyst Michael Baker of Raymond James & Associates, Inc. regarding "who's heading up the integration effort," Neidorff responded that "Cindy Brinkley [Centene's Executive Vice President of International Operations and Business Integration] is heading up the integration," "the Health Net people are fully engaged in participating," and "speaking on behalf of the whole management team, the Board, we are very pleased with the progress at how it's going."

71.     Subsequently, at the Oppenheimer Healthcare Conference on December 9, 2015, Defendant Neidorff stated regarding the Merger that ***"[w]e have good growth and have good visibility into 2016, 2017, a little bit of 2018."*** (Emphasis added).   During the presentation, Defendant Neidorff stated that "[t]here's probably no time in [Centene's] history or in its future that will be more transitional than what we've just done with Health Net.  It has taken us from an also-ran to one of the big four.  It has given us a critical mass and a capability and size that builds a lot of stability into what we're doing."  Neidorff noted that "Health Net had some -- 14 [or] 15 payables or receivables we'll write off . . . at the time we close."  However, there was no mention of the existing problems at Health Net concerning the multiple problems associated with its flawed and unprofitable polices, its refusal to pay substance abuse claims and its potential massive tax liability.

72.     On December 18, 2015, Defendants held an investor conference call regarding the Company's financial guidance for 2016.   During the call, Cynthia Brinkley, stated that in anticipation of the Merger closing in February 2016, the Company "embarked upon a very, very robust planning process."  She stated that Centene hired McKinsey & Company for the integration, and that as part of the "joint process," Centene formed a ten-person (five from each company) integration management office that, among other things, worked to "capture the value and . . . synergies."  Brinkley stated that "we are making significant progress on our integration plans and where we are with the entire transaction."

73.     During the December 18, 2015 conference call, Brinkley further noted that Centene was working with California regulators regarding the Merger and that Centene would have a hearing with the regulators on January 22, 2016.  Brinkley stated that Centene was in the process of "realizing the growth opportunities and putting the company together."

74. Also at the December 18, 2015, Company Investor Day, Defendant Schwaneke stated that "[w]ith regulatory approvals pending, we will not be able to provide additional details associated with the 2016 guidance other than what is presented here today." Although Centene maintained it had "good visibility" into 2016, on January 11, 2016, Neidorff told investors during a JPMorgan Healthcare Conference that "the closing is subject to regulatory approval. And until we receive the final approval, we're going to limit what information we provide to what we did at our Investor Day in terms of revenue and earnings." Thus, until regulatory approval was obtained and the Merger closed, Defendants concealed certain material financial information regarding the Health Net acquisition, in particular the cessation of payments to substance abuse centers, unprofitable policies, and significant potential tax liabilities.

75. However, during this period, Defendants were well-aware of serious problems with Health Net's Arizona business. At the October 27, 2015 Board meeting, Defendants reviewed a slide discussing the integration that warned of the risk that the "Health Net (HN) acquisition may divert focus from ongoing initiatives," and noted that Centene's "management [was] leveraging relationships in AZ in an effort to improve Health Net of Arizona's position in the state." Health Net's financial position in Arizona quickly deteriorated further. At the December 16, 2015 Board meeting, the Board reviewed a slide that noted that "Health Net exited the Arizona Exchange PPO business (which was losing money) . . . ." However, Centene did not write-off that business until July 2016 when it booked a reserve of no less than $90 million for the Arizona business.

## V.    DIRECTOR DEFENDANTS FAILED TO DISCLOSE OR INVESTIGATE HEALTH NET'S INCREASING LOSSES AND LIABILITIES

### A.    Health Net's Mounting Losses on California Policies

76.    In the months leading up to the closing of the Merger, Defendants were particularly focused on Health Net's California policies as part of Centene's efforts to obtain approval from California's insurance regulators, a necessary predicate to the merger's closing.

77.    Defendants repeatedly stressed the need for regulatory approval as a precondition to the Merger's closing.  The Joint Proxy stated that "[p]ursuant to the insurance laws and, in some instances, the health care laws of Arizona [and] California, . . . applicable regulatory authorities must approve of . . . Centene's acquisition of control of Health Net's health maintenance organization and insurance companies."  Defendants further stated that "[t]he parties expect to complete the merger after all of the conditions to the merger in the merger agreement are satisfied . . . including . . . all required regulatory approvals."

78.    Closing of the transaction was delayed from February 2016 because California regulators had not yet approved the merger, which Centene disclosed in a press release attached to a Form 8-K published on February 9, 2016, stating "[t]he Health Net transaction remains subject to California regulatory approval."

79.    Defendants continued to focus on Health Net's California insurance policies in the months leading up to the Merger's closing, as the CDI held a number of lengthy hearings and subjected its approval of the transaction to a number of mandatory conditions being satisfied by Centene.  For example, two investor reports dated March 22, 2016 described conditions imposed by the CDI for approval of the merger, including increasing commercial business in California, providing sufficient networks and products, improving quality of care, and ensuring that no Merger costs will be passed along to consumers.  In March 2016, Centene obtained final regulatory

approval from the DMHC and the CDI to consummate the transaction, which closed on March 24, 2016.

80.     In light of the importance of Health Net's California business to Centene, the lengthy ongoing discussions with and hearings before the California regulators, the extensive integration efforts between the companies, regular reports on the integration efforts by management to Centene's Board, and prior history of Health Net's increasing negative claims experience, the Director Defendants were aware of the poor product design and lack of profitability of Health Net's California policies, its unprofitable Arizona business,  and its refusal to pay claims from substance abuse providers.  In particular, by January 2016 not only had Health Net exited the PPO business in Arizona, but there were industry reports of Health Net's refusal to pay substance abuse claims, as discussed *infra*, which put the Director Defendants on notice that Health Net's practices created additional substantial liabilities and posed a significant risk to the still pending Merger.

### B.      Centene Failed to Disclose Health Net's Mounting Liabilities for Substance Abuse Claims

81.     During the nearly ten-month due-diligence and integration period ending with the Merger (June 1, 2015 to  March 24, 2016), the Board held no fewer than ***eight*** meetings, at which it routinely received reports from Centene staff that advised them of the due diligence results and integration efforts.  The Audit and other committees also met numerous times during this period.

82.     ███████████████████████████████████████████████

████████████████████████████████████████████████████████

Health Net started refusing to pay escalating claims for patients in substance abuse programs in violation of California insurance laws.  By no later than mid-January 2016, well before the Merger closed, Health Net reportedly ceased ***all*** reimbursement for substance abuse treatment centers in

California and Arizona, premised on a purported "audit" by Health Net of all or substantially all of the substance abuse treatment centers in California which had submitted claims.

83.     As part of its audit, Health Net allegedly sent form letters from the Health Net Director of SIU, Matthew Ciganek, to the treatment centers that threatened "legal proceedings" and "sanctions" and required compliance with numerous unreasonable requirements.  Health Net unilaterally imposed onerous burdens on the treatment centers, while suspending payments without any substantive or legal basis.  Among other things, the form letters (i) failed to identify any specific misconduct by treatment centers, yet mentioned Health Net's "right to institute legal proceedings" and "seek appropriate sanctions from the court"; (ii) requested extensive and unusual amounts of documentation in a short time frame; (iii) were followed by numerous duplicate letters requesting copies of the treatment centers' licenses and other information, at times even after such information had already been provided to Health Net; and (iv) imposed substantial costs of compliance in terms of administrative burden and delivery costs.

84.     The "audit" and suspended payments for substance abuse-related claims extended for months -- from late 2015 until well after the Merger.  During and after this time, the treatment centers refused to accept Health Net patients, driving down Health Net's incurred claims.  Liabilities for unpaid claims mounted, yet remained concealed and off Health Net's and Centene's books.  Health Net also unilaterally changed treatment codes billed by medical professionals in order to lower costs, even though Health Net policies did not permit such unilateral changes.

85.     Leading up to the March 24, 2016 Merger date, Defendants knew of the baseless "audit," which was reported in industry press in January 2016.  The Director Defendants and Centene, which was in the process of integrating Health Net and seeking approval from California regulators, were undoubtedly aware of the purported "audit" and non-payment of claims.  Indeed,

following the closing of the Merger, Centene continued Health Net's practice of not paying or otherwise denying these claims.

86.     In May 2016, a group of California treatment facilities sent CDI Commissioner Dave Jones a letter informing him of the "inappropriate dragnet audit of California substance abuse treatment facilities by Health Net."   Individual facilities that had previously filed formal complaints with the CDI reported receiving cease and desist letters from Health Net, prompting the concerted effort.

87.     The joint letter alerted the CDI that Health Net's "dragnet audit" applied to "essentially every [California] facility," and requested documentation for treatment already completed, amounting to a claw back of reimbursements already paid. In addition, treatment facilities reported receiving improper or insufficient payments from Health Net. And even for facilities who received payments on claims, "[i]nstead of paying 75% of billed after all co-insurance has been met, Health Net is now paying pennies on the dollar." The treatment centers reported to the CDI that they would be unable to accept future Health Net policyholders unless Health Net reimbursed them for claims.  Treatment centers in Arizona reported similar complaints to the Arizona Department of Insurance, stating that Health Net had also failed to reimburse those treatment centers.

88.     On May 31, 2016, the CDI announced that it had begun an inquiry into whether Health Net had failed to properly submit payment for insurance claims to over 118 addiction treatment centers in California and Arizona.[9]  On July 23, 2017, the CDI issued an order to show cause regarding the complaints it had received from the substance abuse treatment centers over the

_____

[9] Chad Terhune, *Regulators Probing Whether Health Net is Stiffing Drug Treatment Providers*, California Healthline (May 31, 2016), https://californiahealthline.org/news/regulators-probing-whether-health-net-is-stiffing-drug-treatment-providers/

delayed, denied, or attempted claw back payments. CDI declared in the order that, "Health Net's payment under this  methodology is a misrepresentation of the policy terms and resulted in the underpayment and unfair settlement of claims," attempting to use payment terms not included in the policies as written. CDI also made clear that Health Net violated California law in refusing these payments, including the California Unfair Competition Law and the Mental Health Parity and Addiction Equity Act of 2008. CDI stated that Health Net had engaged in unfair or deceptive business practices by failing to settle provider claims in good faith, even where its liability was reasonably clear, and that CDI would subject the company to a penalty of up to $10,000 for each violation.

89.     On June 30, 2016, a group of California treatment centers sued Health Net, seeking at least $55,000,000 in unpaid claims. *Dual Diagnosis Treatment Ctr., Inc.v. Health Net, Inc.* No. LC104357 (Cal. Super. Ct. filed June 30, 2016).   That complaint alleges that Health Net's misconduct is part of a "sad pattern of prioritizing dollars over decency[,]" noting that regulators have repeatedly fined Health Net for similar misconduct, including a 2007 million-dollar fine by the California Department of Managed Health Care for Health Net's failure to disclose the existence of a bonus program to pay employees for rescinding policies, and a 2008 suit against Health Net by the Los Angeles City Attorney "for issuing policies to applicants with no review, collecting premiums, and then, only *after* policyholders submitted claims for medical services, retroactively conducting investigations into their medical history so as to delay payment or cancel coverage." *See id.*

90.     As a further result of Health Net's, and later Centene's, alleged continuing wrongful refusal to pay claims, on July 22, 2016, another group of treatment centers filed an action against Health Net and Centene seeking at least $150,000,000 for unpaid claims.   *See Chapter 5*

*Counseling Ctr. LLCv. Health Net, Inc.,* No. CV2016-009984 (Az. Super. Ct. filedJuly 22, 2016).

Significantly, the treatment centers also charged Health Net and Centene with violations of patient

privacy under HIPAA, violations of various insurance statutes, and the filing of false financial

statements with the California Department of Insurance by failing to include the significant

liabilities associated with these claims.  *See id.*  On August 10, 2016, more treatment centers filed

a similar action in Los Angeles County Superior Court.  *See Alta Ctrs., Inc. v. Health Net, Inc.,*

No. BC630332 (Cal. Super. Ct. filed August 10, 2016).

91.



Ultimately, Centene recorded $160 million in reserves related to claims from substance abuse facilities.  Centene attributed $119 million of the reserves to Health Net pre-Merger and $41 million to Health Net post-Merger.

### C.     Centene's Q1 2016 Financial Statements and Form 10-Q

92.     Against this backdrop of Health Net's continuing improper refusal to pay treatment center claims, and the poorly designed products and non-profitable policies, on April 26, 2016, just one month after the Merger, Centene published pro forma financial statements purportedly including Health Net's assets and liabilities.  In its Q1 2016 financial results, Centene noted that the Health Net integration process "is proceeding as planned," noting that the Health Net acquisition was "accounted for as a business combination, which requires that assets acquired and liabilities assumed be recognized at their *fair values as of the acquisition date*" thus assuring stockholders that reserves to pay insurance claims were adequate.  (Emphasis added).  Centene's financial statements provided estimates of these amounts, but did not identify any specific reasons why its accounting for Health Net's liabilities were at risk of changing, that certain policies were poorly designed, that unpaid liabilities to substance abuse treatment centers were mounting due to Health Net's refusal to pay, ███████████████████████████████████ █████ and were subject to further adjustment.  By this time -- more than ten months after starting its due diligence -- Centene and the Director Defendants had full access to Health Net's financial records and understood both the poor product design and Health Net's reserves methodologies and knew of the ongoing denial of payments to substance abuse centers.  ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████

**D.      Misrepresentations Made in Centene's April 2016 Form 10-Q**

93.      In a Form 10-Q filed with the SEC on April 26, 2016 (the "April 2016 Form 10-Q") following the Merger, Centene reported the purported value of the Health Net assets and liabilities that Centene had acquired, that Centene had assumed in the Merger (in millions):

| Assets acquired and liabilities assumed | | |
|---|---|---|
| Cash and cash equivalents | $ | 1,422 |
| Premium and related receivables | | 1,076 |
| Short term investments | | 40 |
| Other current assets | | 670 |
| Long term investments | | 1,965 |
| Restricted deposits | | 36 |
| Property, software and equipment, net | | 43 |
| Intangible assets | | 1,500 |
| Other long term assets | | 203 |
| Total assets acquired | | 6,955 |
| | | |
| Medical claims liability | | 1,370 |
| Borrowings under revolving credit facility | | 285 |
| Accounts payable and accrued expenses | | 1,928 |
| Return of premium payable | | 375 |
| Unearned revenue | | 117 |
| Long term deferred tax liabilities | | 415 |
| Long term debt | | 418 |
| Other long term liabilities | | 369 |
| Total liabilities assumed | | 5,277 |
| | | |
| Total identifiable net assets | | 1,678 |
| Goodwill | | 3,601 |
| Total assets acquired and liabilities assumed | | 5,279 |

94.      Centene represented that the Health Net figures showed the "fair value" of Health Net's assets and liabilities as of the March 24, 2016 merger date. The April 2016 Form 10-Q stated that, "The acquisition of Health Net has been accounted for as a business combination using the

acquisition method of accounting which requires assets acquired and liabilities assumed to be recognized at fair value as of the acquisition date." Centene included the caveat that, "[d]ue to the timing of the acquisition date, the Company has performed limited valuation procedures, and the valuation of nearly all assets and liabilities assumed is incomplete."

95.     In fact, prior to the Merger Centene had performed its own pro-forma "adjustments" for its financial advisors, Allen & Co. and Evercore, who were directed to use those numbers in evaluating the fairness of the Merger.  Centene's narrative that it had only obtained "full access" to information regarding the value of Health Net's liabilities after Merger closed on March 24, 2016 was false.  ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

96.     In Centene's prior SEC filings on September 17, 2015, September 21, 2015 and January 26, 2016, before the merger closed, Defendants accompanied the Company's valuation of Health Net with the following language:

> At this time, Centene does not have sufficient information as to the amount, timing and risk of cash flows of all of Health Net's identifiable intangible assets to determine their fair value.  Some of the more significant assumptions inherent in the development of intangible asset values, from the perspective of a market participant, include: the amount and timing of projected future cash flows (including revenue and profitability); the discount rate selected to measure the risks inherent in the future cash flows; and the assessment of the asset's life cycle and the competitive trends impacting the asset.  However, for the purposes of these unaudited pro forma condensed combined financial statements and using publicly available information, such as historical revenues, Health Net's cost structure, industry information for comparable intangible assets and certain other

high-level assumptions, the fair value of Health Net's identifiable intangible assets and their weighted-average useful lives have been estimated . . . .

* * *

***Once Centene has full access to information about Health Net's intangible assets, additional insight will be gained . . . .***

(Emphasis added).

97.     These caveats, however, were omitted from Centene's Form 10-Q dated April 26, 2016, because, having merged in March 2016, Centene presumably had "sufficient information" and "full access to information" regarding the value of Health Net's liabilities.  In fact, Centene had full access to all of Health Net's financial information by no later than March 24, 2016, when Health Net became wholly owned by Centene, if not sooner during pre-merger diligence and the ongoing integration process.  By the time they filed their April 2016 10-Q, Defendants possessed sufficient information to know that there would be substantial changes in reserves, but did not provide adequate information, as is required under GAAP, for investors to be sufficiently made aware of those changes.

98.     On April 26, 2016, the same day that the Company reported the pro forma value of Health Net, Centene held a quarterly investor conference call.  During the call, Defendant Neidorff discussed the merger and stated that there were "no surprises" during "the regulatory process in California."  Analyst Matthew Borsch from Goldman Sachs asked whether the "large book at Health Net [of] ACA exchange members[] [–] is it profitable now? . . . And what level of profitability is that?"  Centene's EVP of Markets, Rone Baldwin, responded that ***"the exchange business at . . . Health Net has been profitable***. (Emphasis added).  The one area of challenge with respect to the exchange business at Health Net has been Arizona."  Baldwin did not disclose that the Arizona business was unprofitable and had to be exited.  Baldwin misleadingly stated that

43

for Health Net's policies in "California, [Health Net] pursue[s] a strategy . . . [t]hat has worked well for them."

### E.      Post-Merger Misrepresentations Regarding the Adequacy of Health Net's Reserves

99.      Centene then repeatedly reassured investors and analysts that the Company had set aside and accounted for adequate reserves to cover Health Net liabilities.  Beginning on May 5, 2016 and continuing through at least June 17, 2016, Centene made presentations at multiple analyst conferences.  The adequacy of Health Net's reserves was critical to analysts' and stockholders' valuation of the Merger.  Analysts repeatedly asked Centene's management about its reserves and the integration of Health Net. Specifically: (i) whether there had been "any surprises or challenges or positives, negatives, or things you can highlight?"; and (ii) whether "[t]here [are] any other things that you've had to do to bring them [Health Net] into -- up to snuff in your accounting balance sheet?"   Centene's management including Defendants Neidorff and Schwaneke, ***repeatedly*** confirmed that there had been no surprises or changes necessary to the balance sheet, that the Company's reserves were adequate, that the Health Net reserve issue had been put to bed as of March 24, 2016, and that there were no unfavorable developments.

100.      For example, on May 24, 2016, in response to an analyst's question at the UBS Global Healthcare Conference regarding any surprises or challenges associated with the merger, Neidorff stated that "I think it's all been where we expected, and it's probably a little bit-- it's been fine. We officially closed on the 24th, but we had nine months ahead of that, in round numbers, working on the integration as anyone would do. So the day that we closed, we were just implementing things we've been planning for for nine months."  Neidorff noted that "our mentality is you really start your integration when you're doing diligence even before you sign the contract. That's when you're learning things about the Company. You should be thinking at that point what

are we going to do if we consummate this deal? And so that's been going on for a year, and it's come -- if anything, I think we're ahead of schedule."

101.    Neidorff was also asked by A.J. Rice of UBS whether there were "any other things" that Centene had done "to bring [Health Net] up to snuff in [its] . . . balance sheet?" Neidorff stated "[n]o" and that "in reality, after about 60 days you have a significant development of reserves, in the 90s. So everything we're seeing says it's fine."

102.    On June 17, 2016, less than two weeks before the end of the quarter, Centene held an Investor Day attended by seven of Centene's executives, including Defendants Neidorff and Schwaneke. During the presentation, Defendant Neidorff stated that "Health Net is Centene's California health plan" and that *stockholders should not have "any concerns . . . regarding Health Net's reserves prior to the March 24[, 2016] closing date," that the Company "ensure[d] the adequacy of medical claims reserves," and that there had not been any "unfavorable development" on Health Net's reserves as management had not "seen any development on anything prior to [March] 24[, 2016]."* (Emphasis added). Centene also presented a slide (published on its website) stating that Centene had applied its "Reserving Methodologies to Health Net's Book of Business":



103.    In providing an "update on the Health Net finance transaction," Defendant
Schwaneke stated that "[s]ince the acquisition we have faster visibility into financial information"
and that ***"[o]n a monthly basis[,] Centene's finance team has been reviewing and monitoring
the medical claims reserves and development."*** Centene also presented the following slide at the
conference:



104.    In response to Jefferies' analyst Dave Windley's inquiry that there had been "no unfavorable development on the acquired Health Net medical reserves" Schwaneke reassured investors that there was merely a "potential for adjustment," but that "we haven't seen any unfavorable development" since the Company's accounting for Health Net provided on April 26, 2016. Analyst Christine Arnold from Cowen and Company again asked about the Health Net insurance reserves, stating, "I'm sorry to beat up on it, but it's something that's really on people's minds. You said that the reserves, there was no negative development, and is that related to both the first quarter and 2015? Or how did 2015 develop?" Mark Brooks, Centene's SVP and Chief Information Officer, responded that "***That's really just the opening balance sheet so that's as of the time of the transaction . . . . [T]he March 24 reserve balance includes all prior activity***." (Emphasis added).   Brooks reassured investors again that "***in total we haven't seen any development on anything prior to [March] 24[] [2016]***." (Emphsis added).  Adding to this point, Defendant Neidorff stated, "[t]hat's an important point that . . . the Health Net reserve issue stops

at March 24 . . . ." (Emphasis added). Centene presented the following slide regarding reserves at the conference:



105.    During the same June 17, 2016 presentation, Defendant Neidorff had a "final" comment on the Health Net reserves:

> I made a couple comments during the break so, it is my hope that the Health Net reserves have now found a comfortable bed as I think it's that kind of issue; it's one that's behind us at this point.

106.    Contrary to these public statements, Defendants knew Centene had not applied its reserving methodologies to Health Net's book of business. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



**F.**     **Centene Concealed Health Net's Potential Billion-Dollar Tax Liability Prior to and After the Merger**

107.    On October 20, 2015, just days before the stockholder vote on the Merger, a California taxpayer filed an action alleging that Health Net, among others, is an "insurance plan" under California law, and thus is required to pay a 2.35% gross premium tax on the premiums it collects each year. *See Myers v. State Bd. of Equalization,* No. BS158655 (Cal. Super. Ct.  filed Oct. 20, 2015).  This material tax liability was not news to either Health Net or Centene, as litigation regarding the gross premium tax's application to health insurers has been ongoing in California state courts since at least 2013.

108.    Underscoring the seriousness of Health Net's exposure, on September 25, 2015— nearly one month before the Tax Litigation was filed—the California Court of Appeals for the Second District issued a significant decision in a widely followed related case, potentially affecting the tax liabilities of all California health insurers including Health Net and Centene.  In a prior taxpayer action brought against Anthem Blue Cross and Blue Shield of California, which engages in the same business as Health Net, the appeals court reversed a lower court's dismissal of the suit, holding that, under the California Constitution, these companies "should be regarded as 'insurers' for the purpose of assessing the gross premium tax." *Myers v. State Bd. of Equalization,* 240 Cal.

App. 4th 722, 742 (Cal. Ct. App. 2nd 2015).  State Senator Bill Monning, a member of the Senate

Health Committee, later commented that "[t]his is clearly a monumental case for California and

Californians."[10]

109.    Health Net's potential exposure to this tax is massive.  The Company is alleged to

owe over $900 million in unpaid premium taxes for prior years.  Significantly, it is exposed to the

tax liability in future years of 2.35% on premiums in California, which will impact future earnings

and margins.  Centene and Health Net concealed the lawsuit and potential tax liability prior to the

vote on the Merger, and belatedly conceded, only well *after* the Merger closed, that the Tax

Litigation "could potentially have a materially adverse impact on our financial position and results

of operations." Centene Corp., Annual Report (Form 10-K) (Feb. 21, 2017).  In fact, Centene did

not disclose the existence of the litigation in its SEC filings until after an analyst specifically

questioned Defendant Neidorff about the Company's exposure at a conference in the Spring of

2016.

110.    Significantly, these tax liabilities (either past or future) were ostensibly never

considered in the valuations of Health Net by the Board or its financial advisors in evaluating the

Merger.  None of the projections or values in the Joint Proxy reflected such information.  Nor were

stockholders provided with adjusted values or projections prior to the vote.  The Tax Litigation

exposes Centene to massive liability for the premium taxes Health Net failed to pay during the

period preceding the lawsuit, as well as future tax payments.  *See* Centene Corp., Quarterly Report

(Form 10-Q) (June 30, 2016).

---

[10] Tracy Seipel, *California's Four Largest Health Plans Could Owe State $10 Billion in Back Taxes*, The Mercury News (January 21, 2016, 5:02AM), https://www.mercurynews.com/2016/01/21/californias-four-largest-health-plans-could-owe-state-10-billion-in-back-taxes.

111.    Before the Merger, neither Health Net nor Centene disclosed the substantial risk of this massive liability in any public filings, and Centene's Board ignored the Tax Litigation in evaluating Health Net's liabilities, future cash flows, and earnings prior to the vote on the Merger and the closing in March 2016.  In addition, the Joint Proxy represents that Health Net's tax obligations were reviewed by the Director Defendants' advisors; however, the Joint Proxy did not disclose anything regarding the impact of this tax issue.  The failure to assess and disclose this material risk of tax liability, which was known prior to the Merger, is further evidence of management's and the Director Defendants' breaches of fiduciary duty and knowing misconduct surrounding this material liability.  Even after the vote, but before the Merger closed, Defendants ignored published reports of this material financial risk until months after the closing.

G.    **Centene Failed to Adequately Investigate or Disclose Health Net's Alleged Involvement in Fraudulently Overcharging the Government**

112.    On February 21, 2017, Centene revealed in its Form 10-K that, on December 15, 2016, it had received a CID from the DOJ related to a federal Whistleblower Suit in which Health Net was named as one of the defendants.

113.    The Whistleblower Suit alleges that UnitedHealth and UnitedHealth's subsidiary Optum, Inc. (f/k/a Ingenix, Inc.) ("Optum"), which performed risk adjustment and billing services for Health Net, submitted false information to CMS to improperly increase the amounts CMS paid UnitedHealth and other insurers, including Health Net.  According to the Whistleblower Suit, Health Net may have submitted false claims to Medicare by using UnitedHealth's billing services thereby exposing the Company to loss of government contracts, fines, and other sanctions.

114.    Bolstering the Whistleblower Suit, on May 16, 2017, the DOJ, after conducting its own investigation, filed a Complaint in Partial Intervention in the same Whistleblower Suit (the "DOJ Action").  The DOJ Action alleges that UnitedHealth, through Optum, "knowingly and

improperly" submitted to the government medical diagnoses for reimbursement even though a "significant percentage" of those diagnoses were not supported by the beneficiaries' medical records.  The DOJ Action estimates that, because of UnitedHealth's scheme, the government has overpaid by more than $1 billion over the past 10 years.

115.     One of the principal reasons for the Merger included Health Net's government contracts business and Centene's objective to grow its government business following the Merger. The prospect of government sanctions and loss of business stemming from the DOJ investigation would have a material impact on Centene's business and growth strategy.

116.     Management's failure to adequately investigate or disclose Health Net's alleged involvement in UnitedHealth's scheme has exposed Centene to government investigations and potential lawsuits, including the Whistleblower Suit.  The allegations, if substantiated, may implicate Health Net, which is already alleged as a culpable defendant in the *qui tam* complaint. Further scrutiny may uncover that Health Net's alleged improper practices continued after Centene management took over, exposing Centene to further liability and creating a risk that Centene's substantial Medicare revenue stream will be impacted.  At the very least, the Company will incur significant costs in investigating and responding to the CID and the Whistleblower Suit.  Centene management's failure to adequately investigate or disclose the facts underlying the lawsuit caused it to overpay for its acquisition of Health Net, and exposed Centene to substantial legal, regulatory, and business risks going forward.

## VI.     CENTENE ANNOUNCES A $390 MILLION INCREASE IN RESERVES

117.     On July 26, 2016, Centene released Q2 2016 financial results and announced a massive increase in "reserves for medical claims associated with disputed substance abuse treatment center costs" -- described above – and "recorded premium deficiency reserves primarily associated with Arizona and the California individual PPO business."  Centene increased reserves

by $90 million for unpaid substance abuse treatment center claims--which were known of no later than January 2016, ***well before the Merger closed*** -- and further recorded premium deficiency reserves of $300 million "representing the fair value of underperforming contracts for the period from March 24, 2016, through December 31, 2016."  These contracts were not new or recently underperforming contracts but rather a significant component of Health Net's previously underperforming business and poor product design.  ***Centene eventually acknowledged in its 2016 10-K that these liabilities were "based on cost trends existing prior to the acquisition date."*** (Emphasis added).  In short, liabilities had increased because the Company's costs had skyrocketed and revenues had decreased, impacting earnings.  During an investor conference call Centene stated that this increase was "really . . . for prior issues" that were "as of March 24[, 2016]" and were "associated with disputed substance abuse treatment center claims."[11]

118.    The $390 million increase in reserves dwarfed Health Net's entire annual pre-tax earnings in recent years, and reduced Centene's cash flows by the same amount.  On July 27, 2016, in an interview by securities analyst Jim Cramer, ***Defendant Neidorff admitted Centene knew at the time it bought Health Net that certain California policies had a "bad product design" and stated "[t]his is something we inherited.  And it was prior to the 24th [of March] when those things were set."***  (Emphasis added).

119.    Neidorff stated that he had "***personally been involved in and pushing and discussing***" changes to the policy plan design, as Centene had been "***working with the states at the highest levels to redesign the PPO product***" and "[t]here were major flaws in it." (Emphasis added). Neidorff stated that Centene had been working on the plan design "for the past several months" and that the increased liabilities recognized on July 26, 2016 regarded "a whole list of

---

[11] Centene Corp., CNC – Q2 2016 Centene Corp Earnings Call (Thomson Reuters Streetevents 2016).

issues that have been dealt with very aggressively."  Neidorff stated, "I've had several meetings personally with Commissioner Jones," and continued: "We've talked about it . . . We've talked about the actions we are taking" and "we are being very aggressive in fixing it."  Defendants stated that "the issue we had in the PPO is isolated to the PPO products in California" and "[w]e have taken steps to mitigate the substance abuse treatment center costs in the individual commercial business in California, including modifications to plan design."

120.   Centene representatives did not suggest that these additional reserves were due to any recent or surprising development.  Analysts directly questioned the Company's credibility and noted that the "disclosures . . . reveal that [Health Net] was likely descending towards a much tougher earnings situation on a standalone basis than previously suggested by [management]."  Indeed, the disclosure stood in stark contrast to Centene's pre-Merger public statements that with respect to Health Net's business and the Merger, Centene had achieved "good stability" and it had "good visibility into 2016, 2017, [and] a little of 2018."  Analyst Chris Rigg from Susquehanna Financial Group asked in the July 26, 2016 earnings call whether "the $90 million is basically for the 27-ish month of really 2014, 2015 and about three months of 2016." Defendant Schwaneke admitted that the $90 million was for "everything prior to March 24[, 2016]" and that all of the $90 million in increased liabilities related to the substance abuse-related claims in California.

121.   In a Form 8-K also filed on July 26, 2016, Centene explained the composition of the $300 million in increased liabilities:

- $125 million associated with the California commercial business, $50 million of which is associated with substance abuse treatment facilities. We have filed for a combination of price increases and benefit design changes including reductions in reimbursement for out of network services. We are in the final stages of approval with the California Department of Insurance, which will be concluded by the end of the third quarter of 2016.

- $70 million associated with the Arizona individual commercial business. We will exit the entire individual PPO business, effective January 1, 2017. We are reducing our participation in the health insurance marketplace business to one county for 2017 and have taken significant rate actions.

- $70 million associated with the Medicare business. The 2017 bids have been submitted and should return the business to profitability in 2017.

- $15 million associated with the Arizona Medicaid business.  We have fully transitioned this business to Centene's operating platform as of July 1, 2016, and we have taken appropriate actions to improve performance.

- $20 million of other smaller items including the Arizona small group and Oregon individual business. We have filed for rate increases and taken other appropriate actions to address these for 2017.

122.    Centene accounted for the approximately $300 million in increased liabilities for the period of March 25, 2016 through December 31, 2016 by booking a "premium deficiency reserve," or "PDR."  PDRs are required when there is a probable loss on unearned insurance premiums.  Centene's use of purchase accounting rules to record the PDR in the manner presented violated GAAP. ███████████████████████████████████████████

███████████████████████████████████  ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████

123.    Centene's massive reserve increase impacted Centene's accounting for the Health Net assets acquired and liabilities assumed in the Merger. Centene reported that Health Net's medical claims liabilities were $92 million higher, its accounts payable and accrued expenses were $102 million higher, its total liabilities were $211 million higher, and its net assets $245 million lower than Centene had reported on April 26, 2016. In contrast to the figures presented in the April 2016 Form 10-Q Centene corrected its accounting for Health Net as follows:

**Assets acquired and liabilities assumed**

| | |
|---|---:|
| Cash and cash equivalents | 1,368 |
| Premium and related receivables | 1,086 |
| Short term investments | 82 |
| Other current assets | 638 |
| Long term investments | 1,966 |
| Restricted deposits | 36 |
| Property, software and equipment, net | 41 |
| Intangible assets | 1,500 |
| Other long term assets | 204 |
| Total assets acquired | 6,921 |
| | |
| Medical claims liability | 1,462 |
| | |
| Borrowings under revolving credit facility | 285 |
| Accounts payable and accrued expenses | 2,030 |
| Return of premium payable | 375 |
| Unearned revenue | 117 |
| Long term deferred tax liabilities | 349 |
| Long term debt | 418 |
| Other long term liabilities | 452 |
| Total liabilities assumed | 5,488 |
| | |
| Total identifiable net assets | 1,433 |
| Goodwill | 3,850 |
| Total assets acquired and liabilities assumed | 5,283 |

124.    In 2013 and 2014, Health Net averaged only $235 million annually in pre-tax earnings. The over $300 million in increased liabilities for 2016 greatly outstripped those annual earnings figures.

125.    In response to the announcement, Centene's stock price fell from $75.26 to $68.87, erasing over $1 billion in stockholder value.  The increase in liabilities further call into question Centene's representations in the Joint Proxy regarding the value of Health Net as reflected in various pre-Merger financial projections which were based, in substantial part, on Health Net's estimated pre-tax earnings, assets, liabilities and anticipated cash flows.  Defendants abject failure to consider these liabilities in financial projections used to value Health Net and their concealment of the massive risks inherent in the acquisition, were gross violations of their fiduciary duties to

perform reasonable due diligence on Health Net's principal line of business and their duty of disclosure with respect to the Joint Proxy, and constitutes bad faith.

126.    Indeed, despite the importance of Health Net's California business to Centene as a reason for the Merger, as well as the critical financial metrics of the profitability of Health Net's policies and adequacy of reserves, the Director Defendants abandoned their responsibility to perform *any* due diligence on the adequacy of Health Net's reserves. ███████████

███████████████████████████████████████   ████████████████████

███████████████████████████████████████████████████████████

████████████████████

127.    On July 27, 2016, Defendant Neidorff reiterated that the increase in reserves was due to claims experience that had increased long before the Company's corrective disclosures. With respect to Centene's second quarter accounting charges, Jim Cramer stated that the reserve increase was a "red flag" because Centene had "increased its substance abuse treatment cost reserves by $90 million as well as recording a $300 million premium deficiency reserve for its business in Arizona, California, and Oregon – that's what upset people." Neidorff responded that there had been "some issues in California with the individual plan, there were problems in Arizona with non-profitable business," and admitted that "*[w]e knew this when we bought it*."  In short, Neidorff admitted that "*before [Centene] closed*" the Merger, they "knew" that the California policies "had a bad product design," certain products were not profitable and that Centene was "working very closely with the [California] Department of Insurance" to address those issues. (Emphasis added).

128.    On September 7, 2016, Centene's Senior Vice President, Finance and Investor Relations, Ed Kroll, presented at the Wells Fargo Securities Healthcare Conference. During his

presentation, Kroll explained that Health Net "had denied a lot of claims that we subsequently determined should be on the books that had a chance to--they were owed." Kroll also admitted that the California PPO, the Arizona individual business, and Medicare Advantage in Oregon that Centene received from Health Net "*were all losing money in 2015.*" (Emphasis added)

129.     During that conference, an analyst at Wells Fargo Securities detailed the charges that Centene booked, and stated: "*So the simple math is to say that maybe Health Net's earnings really were overstated somewhat when [Centene] bought it*." (Emphasis added).  Kroll did not dispute that characterization, instead stating that the Company had no regrets in buying Health Net.

130.     On September 13, 2016, Defendant Neidorff participated in a presentation at the Morgan Stanley Global Healthcare Conference.  During that conference, Defendant Neidorff again admitted that the Defendants knew of the issues at Health Net when the Company was buying it. In particular, Defendant Neidorff explained that the California PPO had *"some design flaws that were just so obvious* to those of us who have been doing it for a long time." He continued, stating:

> A PPO is designed to give people an option to go out of network, but really it should be designed to encourage people to stay in network. [Health Net's California PPO policies] had none of that. There were no caps on maximum allowances. We had the most liberal – or Health Net had the most liberal PPO out there, which encouraged adverse selection. *We knew that when we bought the company.* We had done our homework.

(Emphasis added). Defendant Neidorff also explained that the Company knew about and was planning on dealing with Health Net's issues "when we announced [the Acquisition]." Although Defendants never disclosed those issues when the Merger was announced on July 2, 2015.

131.     Management's various post-Merger admissions, together with the market's negative reaction to the disclosures, and the magnitude of undisclosed liabilities stand in stark contrast with Centene's repeated assurances of no additional Merger-related financial issues. The

58

facts confirm that Centene's management and the Director Defendants concealed material information concerning the Merger both before and after the closing of the transaction.

132.    In addition, the issuance of false financial statements resulted in the filing of a securities class action alleging GAAP violations related to the Health Net liabilities and Centene must now also contend with the cost of litigating the Treatment Center Actions, which seek over $200,000,000 in damages.  That Centene's management was admittedly aware of these poorly designed policies and related undisclosed liabilities before the Merger, and regularly reported to the Director Defendants on the progress of the integration, demonstrates that the Director Defendants knowingly conducted a deficient due diligence process and then allowed Centene to overpay for its acquisition of Health Net.  The Director Defendants knew about or failed to uncover the magnitude of Health Net's problems in the months leading to the consummation of the Merger and then concealed Health Net's declining financial metrics until months after the Merger.

## VII.    THE INDIVIDUAL DEFENDANTS' DUTIES AND OBLIGATIONS

### A.    Duties of All Individual Defendants

133.    By reason of their positions as officers, directors (and/or fiduciaries) of Centene, and due to their ability to control the business and corporate affairs of Centene and its subsidiaries, the Defendants owed Centene and its stockholders the fiduciary obligations of good faith, loyalty and candor.  The Defendants were obligated to use their utmost abilities to control and manage Centene and its subsidiaries in a fair, just, honest and lawful manner, and to promptly disseminate accurate and truthful information with respect to the Company's business operations, earnings, and compensation practices.  The Defendants were and are required to act in furtherance of the best interests of Centene and its stockholders so as to benefit all stockholders equally, and not in their own personal interest or benefit. This fiduciary obligation includes the obligation to accurately disseminate financial information in connection with any stockholder proxy statement

disseminated to Centene stockholders, as well as the timely filing of accurate Company financial information.

134.   The Defendants, because of their positions of control and authority as directors and/or officers of Centene, and their attendance and votes at meetings of the Board and its subcommittees, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.   Because of their advisory, executive, managerial, and directorial positions within Centene, and their attendance at meetings of the Board and its subcommittees, and through their receipt of packages of information distributed in connection with these meetings, each of the Defendants had access to material non-public information regarding the improper business practices and financial health of Centene and Health Net.   As to the Director Defendants, these acts include: soliciting stockholder votes based on an incomplete and materially misleading proxy statement, disseminating false and misleading information in the Company's financial statements, and failing to act to correct such misstatements and omissions in the Company's SEC filings.

135.   The Defendants' conduct complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Centene, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders, which the Defendants were or should have been aware of, posed a risk of serious harm to the Company.

136.   To discharge their duties, the officers and directors of Centene were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company and its subsidiaries.   By virtue of such duties, the officers and directors of Centene were required to, among other things:

- Exercise good faith to ensure that the affairs of the Company and its subsidiaries were conducted in an efficient, business-like manner to make it possible to provide the highest quality performance of their business;

- Exercise good faith to ensure that the Company and its subsidiaries were operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

- When put on notice of problems with the Company's and/or its subsidiaries business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

137.    Centene has established a set of written Corporate Governance Guidelines ("Guidelines") which are published on its website.  The Board is responsible for assessing the qualifications of each Board member, which includes considering, among other things, members' independence, diversity, age and freshness of perspective.  Contrary to established good corporate governance practices, Centene provides for three-year staggered terms for Board members with no limit on the number of terms.  Seven of Centene's nine Board members have served as directors continuously for over 12 years.  With respect to Board committees, the Guidelines provide that the Board should consider "rotating committee members periodically" and "that each committee will annually evaluate its performance."  Centene violated its own internal corporate governance guidelines by having little or no rotation among committee members or the chairmen who have all served for no less than twelve consecutive years.  *See* ¶¶ 173-174.

138.    Centene's Business Ethics and Conduct Policy (the "Ethics Policy"), as approved by the Board of Directors states that: "It is the policy of the Company to conduct its business affairs in accordance with the standards and rules of ethical business conduct and to abide by applicable laws, both in letter and spirit. In this, there is no room for compromise."  It further requires that "all directors, officers and employees of Centene Corporation comply with the standards contained

in the Code, immediately report any perceived violations and assist in investigating any allegations of wrongdoing."

139.   The Ethics Policy further provides:

**Ethics**

It is the long-standing policy of the Company to observe all applicable laws. This commitment does not stop here. Even where the law is permissive, the Company shall choose the course of the highest integrity. Local customs and traditions differ from place to place. Honesty and integrity, however, are not subject to criticism in any culture. Shades of dishonesty simply invite demoralizing and reprehensible judgments. A well-founded reputation for scrupulous dealings is an invaluable asset. All directors, officers and employees must understand that at Centene Corporation, we care how results are obtained, not just that they are obtained. Each director, officer and employee must be honest and forthcoming about any questionable situation.

140.   Regarding the importance of transparency and accurate record keeping Centene's

Ethics Policy states:

**Financial Records & Controls – Protection of Reputation and Financial Strength**

Centene is committed to encouraging candid communication and transparency by keeping complete and accurate records and implementing appropriate system controls. This commitment includes general business and financial records. Accurate documentation should always be a priority. No employee should enter into any transaction with the understanding that it is anything other than what is described in the agreement and supporting documentation.

All transactions must be transparent and properly recorded. There must be no disbursement or receipt of corporate funds outside the Company's system of accountability. This means there will be no "off books" funds, payments or transactions, no "unofficial" funds, payments or transactions, and that all funds, payments and transactions must be recorded in accordance with the regular accounting process prescribed by the Company.

Our records must be complete and accurate, fully reflecting the Company's activities and transactions including claim payments, medical billing documentation, expenses, purchases, accounts receivable and sales. The information derived from these records is provided to the Company's stockholders, as well as governmental agencies; therefore, processes must follow US GAAP and all relevant laws and regulations. Centene's reputation for

integrity, as well as financial strength, depends on this.

It is difficult to delineate every practice that is or is not permissible, but certain general guidelines can be set forth.  For example, a payment is prohibited if:

- It is illegal

- It is inconsistent with Centene's defined values

- No record of its disbursement or receipt is entered into the accounting records of the Company

- It is entered into the accounting records of the Company in a manner which is false or misleading.

141.   The Company has a stated commitment to honesty and truthfulness:

**Commitment to Honesty – Honesty is Always Centene's Policy**

Honesty means communicating candidly and truthfully in all of our business relationships and transactions. While anyone can make an honest mistake, fraud is different.  Fraud is not a mistake.  Fraud involves deliberate deception.

Fraud is not only unethical, it is also illegal.

142.   Centene's Ethics Policy further warns about potential violations of the Federal False Claims Act ("FCA"):

Under the Federal False Claims Act (FCA) any individual or entity that knowingly submits a false or fraudulent claim for payment of United States Government funds can be held liable for significant penalties and fines. The FCA applies to claims by health care organizations to Medicaid, Medicare and other government sponsored health care programs.

143.   With regard to the dissemination of material corporate information, the Ethics Policy states:

**Inside Information – Fairness and Honesty in the Investment Community**

Centene is committed to always being transparent in how it manages information of interest to the investment community. Employees who have access to confidential or non-public information are not permitted to use or share that information for stock trading purposes or other non-business purpose that might result in personal financial benefit or to serve as a "tip" to others. Using inside

information in this manner is unethical, illegal and could result in civil or criminal penalties. It also violates our commitment to acting with the highest standard of integrity.

"Inside information" is any non-public information that a reasonable investor is likely to consider important in making investment decisions.

Examples of non-public inside information include:

- Projections of future earnings or losses

- News of a pending merger or acquisition

- News of any significant sale of assets or the disposition of a subsidiary

- Declaration of a stock split or an offering of additional securities

- Planned changes in senior management

- Significant new products

- Impending bankruptcy or financial liquidity problems

- The gain or loss of a significant vendor or customer

- The possible awarding or cancellation of a significant contract

Centene discloses financially significant information to the public by issuing press releases and/or by filing reports with the United States Securities and Exchange Commission. Information becomes public once a release appears on a national news wire, or a filing is made, after which the information is posted on Centene's website at www.centene.com.

Centene's board members, officers, certain employees and their related family members may not buy or sell Centene securities based on inside information. Once that information has been properly disclosed, board members and certain employees and their closely related family members must wait two full business days after the announcement before buying or selling Centene securities.

144.    Centene's conflicts of interest policy is also clearly established:

**Conflicts of Interest – Integrity is Our Most Important Value**

Centene is committed to communicating candidly, openly, and honestly with its employees. Employees are expected to do the same when dealing with Centene

or any of its subsidiaries. Conflicts of interest arise when loyalty is divided between the Company's best interest and our own personal interests. Life is full of situations where we have multiple interests, and there is nothing unethical about that. The ethical complications arise only when we act on the basis of our own personal interests rather than those that are in the best interest of Centene.

## B.    Duties of the Director Defendants on the Audit Committee

145.   The Centene Board has delegated additional responsibilities to its Audit Committee (made up of Director Defendants Eppinger, Roberts, Escarra before her departure, and non-defendant director Jessica Blume) through the Company's Audit Committee Charter.

146.   The Audit Committee is responsible for assisting the Board in overseeing: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the qualifications and independence of the Company's independent auditor; (iv) the performance of the Company's internal audit function and independent registered public accountant; and (v) the preparation of the audit committee report as required by the SEC to be included in the Company's annual proxy statement.

147.   The Audit Committee Charter sets forth the duties of each member of the Audit Committee with respect to Centene's audited financial statements:

**Audited Financial Statements**

- Review and Discussion. The Audit Committee shall meet to review and discuss with the Company's management and independent registered public accountant the Company's audited financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and the matters about which Statement on Auditing Standards No. 61 (Codification of Statements on Auditing Standards, AU §380) requires discussion.

- Recommendation to Board Regarding Financial Statements. The Audit Committee shall consider whether it will recommend to the Board of Directors that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K.

- <u>Audit Committee Report</u>. The Audit Committee shall prepare an annual committee report for inclusion where necessary in the proxy statement of the Company relating to its annual meeting of security holders.

148.    For other financial related disclosures, the Audit Committee's responsibilities include:

### <u>Review of Other Financial Disclosures</u>

- <u>Independent Registered Public Accountant Review of Interim Financial Statements.</u> The Audit Committee shall direct the independent registered public accountant to use its best efforts to perform all reviews of interim financial information prior to disclosure by the Company of such information and to discuss promptly with the Audit Committee and the Chief Financial Officer any matters identified in connection with the independent registered public accountant's review of interim financial information which are required to be discussed by applicable auditing standards. The Audit Committee shall direct management to advise the Audit Committee in the event that the Company proposes to disclose interim financial information prior to completion of the independent registered public accountant's review of interim financial information.

- <u>Earnings Release and Other Financial Information.</u> The Audit Committee shall discuss generally the type and presentation of information to be disclosed in the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts, rating agencies and others.

- <u>Quarterly Financial Statements.</u> The Audit Committee shall meet to review and discuss with the Company's management and independent registered public accountant the Company's quarterly financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

149.    Oversight of Centene's internal controls and procedures also fall within the specific purview of the Audit Committee:

### <u>Controls and Procedures</u>

- <u>Oversight.</u> The Audit Committee shall coordinate the Board of Directors' oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of business conduct and

ethics. The Audit Committee shall receive and review the reports of the CEO and CFO required by Rule 13a-14 of the Exchange Act.

- Oversight of Internal Audit Function

  - Oversight. The Audit Committee shall coordinate the Board of Directors' oversight of the performance of the Company's internal audit function.

  - Reporting Relationship. The Audit Committee shall review the reporting relationship of the internal audit function and periodically shall meet separately with the company's internal audit executive.

  - Plans, Budgets and Activities. The Audit Committee shall review for approval the internal audit function's plan, budget and activities for the upcoming fiscal year.

  - Review of Significant Deficiencies. The committee shall review the status of any existing or newly identified significant deficiencies in internal controls over financial reporting on a quarterly basis.

  - Review of Compensation Plans. The Audit Committee shall periodically review the incentive compensation plans for the internal audit function for potential conflicts of interest that may inhibit that function from appropriately discharging it's [sic] duties.

- Risk Management. The Audit Committee shall discuss the Company's policies with respect to risk assessment and risk management, including guidelines and policies to govern the process by which the Company's exposure to risk is handled.

- Evaluation of Financial Management. The Audit Committee shall coordinate with the Compensation Committee the evaluation of the Company's financial management personnel.

150. By reason of the misconduct described herein, Defendants violated the guiding corporate governance principles applicable to Centene's officers and directors thereby demonstrating their bad faith.

**C.     Reporting Requirements under Generally Accepted Accounting Principles and SEC Regulations**

151.    Under GAAP, public companies must record and report financial information, including information about business combinations and financial results, according to certain standards and procedures in order to ensure clarity in financial information brought to the market. The Financial Accounting Standard Board ("FASB") has codified specific GAAP provisions for business combinations, which Centene was required to follow, codified at Accounting Standards Codification ("ASC") 805.

152.    ASC 805 permits companies to publish preliminary estimates of certain assets and liabilities of an acquired company, then later revise those estimates "as of" the acquisition date." ASC 805-10-25-13. Such revisions are only available for "new information" that was not known by the acquirer as of the acquisition date. *See id.*; ASC 805-10-25-16; ASC 805-10-55-16. ASC 805 requires that provisional disclosures for a business combination (referred to as the "measurement period") last for only a limited time, after which time the fair value of a transaction must be determined and disclosed.

153.    Such post-acquisition revisions allow for favorable accounting of acquired liabilities as they do not directly impact the company's income statement in the post-acquisition accounting period; instead, the company records the increased liabilities by means of an increase in the acquired company's "goodwill." *See* ASC 805-10-25-16. A company attempting to hide liabilities acquired in an acquisition may thus attempt to use such acquisition accounting by reporting artificially low liabilities at the time of acquisition, then later accounting for the true liabilities by adjusting reported "goodwill." Such accounting tactics distort a company's balance sheet and understate a company's financial obligations as the company underreports liabilities at the time of acquisition.

154.    However, under acquisition accounting, in order to later account for material increased liabilities "as of" the acquisition date by adjusting "goodwill," the company must provide adequate notice.  When an acquirer provides initial accounting estimates "as of" the time of the acquisition, "the acquirer shall disclose . . . [t]he assets, liabilities, equity interests, or items of consideration for which the initial accounting is incomplete."  ASC 805-20-50-4A.  Such revisions can be made only for "particular assets, liabilities, noncontrolling interests, or items of consideration" that are so identified.  *Id.*  "Goodwill" revisions under ASC 805 are available only for initial accounting estimates that specify the "particular" assets, liabilities, interests, or items that may be revised.  ASC 805 provides for notice as to which accounting estimates may be revised, and thus, by exclusion, which accounting estimates as of the acquisition date are not subject to change.  *See also* ASC 805-10-55-29 (requiring "[i]n accordance with paragraph 805-20-50-4A" that the acquirer make specific disclosures as to particular asset classes of "property, plant, and equipment").

155.    Preliminary accounting statements must specify "on an item by item basis" the "specific" assets or liabilities "that remain preliminary and what the[y] . . . relate to," as well as "provide summarized disclosures that discuss the potential impact of changes in the preliminary purchase price allocations to the acquired assets and liabilities assumed from th[e] acquisition."  Stericycle, Inc., SEC Comment Letter, (June 13, 2016), *citing* ASC 805-20-50-4A.  Also, required is the specific "nature of any assets or liabilities that may ultimately be recorded as part of the purchase price allocation that [the Company is] aware of and [is] currently evaluating but waiting on additional information."  *Id.*  Such financial statements should include "item by item" explanations.  *See* ASC 805-20-50-4A.  The SEC's Financial Reporting Manual further states that

69

"[i]f the [company] is awaiting additional information that may impact the measurement of a contingency of the acquired company," then "[i]n this circumstance, the registrant should:

- Describe clearly the nature of the contingency;

- Discuss the reasons why the allocation is preliminary/provisional (*e.g.,* identify the information that the registrant has arranged to obtain);

- Indicate when the allocation is expected to be finalized; and

- Furnish other available information which will enable a reader to understand the magnitude of any potential adjustment.

SEC Financial Reporting Manual, Division of Corporation Finance.  The SEC Reporting Manual concludes that "[i]n the absence of such disclosure, investors may assume reasonably that the purchase price allocation is final and that all future revisions of estimated fair values of assets and liabilities acquired will be reflected in income."

156.    ASC 805-20-50-4A also mandates that acquirers reporting initial estimates must state "[t]he reasons why the initial accounting is incomplete" for the particular assets or liabilities at issue.  The reasons must be specific to the assets or liabilities for which the initial accounting is incomplete and discuss what information precludes the accounting from being complete.  *See* ASC 805-10- 55-29 (requiring disclosure "[i]n accordance with paragraph 805-20-50-4A").

157.    Guidance on fair value measurement and disclosure is in turn provided at ASC 820, and is designed to ensure that market-based, rather than entity-specific, measurement is used.  ASC 820 defines "fair value" as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."

158.    Specifically, with regard to medical liabilities, ASC 954-450-30-4 provides that "[l]osses under prepaid health care services contracts shall be recognized when it is probable that expected future health care costs and maintenance costs under a group of existing contracts will exceed anticipated future premiums and stop-loss insurance recoveries on those contracts."  ASC

954-450-35-1 also requires that "[e]stimated losses are reviewed and changed, if necessary, at each reporting date.  The amounts of the changes are recognized currently as additional expense or as a reduction of expense."

159.    In addition to GAAP standards, Centene and other public companies are subject to Regulation S-X promulgated by the SEC. Regulation S-X requires that financial statements prepared and submitted to the SEC must be prepared in accordance with GAAP or they will be presumed to be misleading or inaccurate, and that further information must be provided to make the financial information provided not misleading in light of the circumstance in which they were made.

160.    Further, SEC Regulation S-K, Item 303(b), codified at 17 C.F.R. §229.303, requires public companies, including Centene, to disclose in their management discussion and analysis any known trends or uncertainties that management would reasonably expect to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. Regulation S-K explicitly requires that if the Registrant knows of events that will cause material change in the relationship between costs and revenues (such as a known future increase in costs of labor, or materials, or price increases) it must be disclosed in the S-4 such as the Joint Proxy.  17 C.F.R. § 229.303(2)(3)(ii).

161.    As directors of a large public company, the Director Defendants were aware of or were made aware of these requirements by the due diligence they conducted before the Merger, as reflected in their retention of financial and legal experts in connection with the Merger including Allen & Co., Evercore and Skadden, and as a result of the ongoing financial presentations provided during the integration process and post-Merger. Defendants violated GAAP by approving the

issuance of materially false and misleading financial statements in Centene's public filings and other statements to the public.

## VIII.   STOCK SALES BY THE INSIDER SELLING DEFENDANTS

162.   The Selling Defendants, Neidorff, Gephardt, Schwaneke, Goldman, and Baldwin, used their knowledge of Centene's material, nonpublic information to sell their shares of Centene stock at a time when Centene's stock was artificially inflated.   These sales violated Centene's internal policies regarding insider trading and applicable law.

163.   While in possession of material, nonpublic information, Defendant Neidorff disposed of 367,427 shares of Centene stock, worth $19,950,436.04.   These dispositions occurred between December 10, 2015 and December 31, 2015.   The disposition of stock came in the form of relinquishment to the Company in exchange for Centene paying Neidorff's taxes.   Thus, Neidorff had the Company purchase its own stock from him at an inflated price.   These sales are suspicious because at this time Neidorff admittedly possessed material non-public information concerning Health Net's poorly designed policies, unprofitable products in California and Arizona, the potential massive tax liability and Health Net's mounting unpaid claims from substance abuse providers.

164.   Defendant Gephardt sold 15,910 shares of his Centene stock on June 28, 2016 and June 29, 2016, for total proceeds of $1,096,058.20.   These sales are suspicious because they occurred barely a month after Gephardt entered into a 10b5-1 trading plan on May 26, 2016, the stock sales represented 28% of Gephardt's holdings of Centene stock, and Gephardt had not sold any stock during the same period immediately prior to the beginning of the improper statements alleged herein.   These sales are also suspicious because Gephardt entered into a 10b5-1 trading plan and sold stock while in possession of material non-public information concerning Health

Net's poorly designed policies, unprofitable policies in California and Arizona, the potential massive tax liability and Health Net's mounting unpaid claims from substance abuse providers.

165.    Defendant Schwaneke disposed of 7,450 shares of his Centene stock, worth over $422,815.   These dispositions occurred between December 8, 2015 and February 9, 2016. Schwaneke relinquished over 5,000 shares to the Company, worth almost $300,000, in exchange for the Company paying his taxes.   Thus, Schwaneke had the Company purchase its own stock from him at an inflated price.   Schwaneke also sold 2,000 shares of his Centene stock for proceeds of over $130,000.   These sales are suspicious because at this time Schwaneke admittedly possessed material inside information concerning Health Net's poorly designed policies, unprofitable products in California and Arizona, the potential massive tax liability and Health Net's refusal to pay claims to substance abuse providers.

166.    Defendant Baldwin disposed of 37,858 shares of his Centene stock, worth over $2,318,253.   These dispositions occurred between November 30, 2015 and July 1, 2016. Defendant Baldwin relinquished almost 20,000 shares to the Company, worth over $1.1 million, in exchange for the Company paying his taxes. Thus, defendant Baldwin effectively had the Company purchase its own stock from him at an inflated price. Defendant Baldwin also sold 18,000 shares of his Centene stock for proceeds of almost $1.2 million.

167.    Defendant Goldman disposed of almost 70,000 shares of her Centene stock, worth over $4,272,759. These dispositions occurred between October 29, 2015, and March 23, 2016. Defendant Goldman relinquished over 24,000 shares to the Company, worth almost $1.4 million, in exchange for Centene paying her taxes. Thus, Goldman had the Company purchase its own stock from her at an inflated price. Goldman also sold 45,000 shares of her Centene stock for proceeds of almost $2.9 million.

168.     Each of the Selling Defendants was unjustly enriched from their sales of Centene common stock as described herein.   The stock sales by Neidorff and Gephardt render them interested directors for purposes of demand futility.

## IX.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

169.     Plaintiffs bring this action derivatively for the benefit of Centene to redress injuries suffered, and to be suffered, by Centene as a direct result of the Individual Defendants' breaches of fiduciary duty and other violations of law as alleged herein.   Centene is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

170.     Plaintiffs will adequately and fairly represent the interests of Centene and its shareholders in enforcing and prosecuting their rights and has retained counsel competent and experienced in derivative litigation.

171.     Plaintiffs were stockholders of Centene at the time of the wrongdoing complained of, have continuously been stockholders since that time, and will continue to hold Centene stock through the resolution of this Action.

## X.     DEMAND FUTILITY ALLEGATIONS

172.     The current Board of Centene consists of the following *nine* individuals: defendants Neidorff, Ayala, Ditmore, Eppinger, Gephardt, Roberts, Steward, Thompson and non-defendant Blume.   Plaintiffs have not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below and is therefore excused.

173.     A majority (seven of nine directors) of Centene's Board has been in place for at least 12 consecutive years, evidencing an entrenchment and lack of diversity contrary to good corporate governance standards and the Company's own guidelines.   The Director Defendants

have also instituted several self-serving measures that foster their entrenchment and that are antithetical to their accountability to stockholders, including: imposing a staggered board and "classes" of directors, so that only two or three directors are answerable to public stockholders at any given annual meeting; limiting stockholder proxy access to a 30-day period; instituting a "maximum number" of two stockholder nominees per annual meeting; and imposing other restrictions on stockholder proxy access.

174.    Moreover, the Director Defendants' lack of independence from management is further exacerbated by the fact that every Board committee has had the same chairperson for no less than 12 years -- with barely any turnover of committee members in direct contravention of Centene's governing principles.  The lack of diversity, independence, and freshness of perspective has resulted in a complacent Board that readily accedes to management's decisions without dissent and re-nominates the same twelve directors year after year.

**A.    Demand is Futile as to All Director Defendants Because the Director Defendants Face A Substantial Likelihood of Liability**

175.    The Director Defendants face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the time of the misconduct referenced above, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.  The Selling Defendants also had a duty not to sell Centene stock while in possession of material non-public information.

176.    Moreover, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with

the required diligence and due care. Instead, the Director Defendants knowingly and/or with reckless disregard reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of Health Net and Centene.

177.    The Director Defendants' making or authorization of these false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of fiduciary duties that have resulted in the Director Defendants facing a substantial likelihood of liability. If the Director Defendants were to bring a suit on behalf of Centene to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This renders each of them interested and, for this reason also, demand is futile.

178.    Defendants Neidorff, Ayala, Ditmore, Eppinger, Gephardt, Roberts, Steward, and Thompson also face a substantial likelihood of liability for breaching their fiduciary duty by failing to conduct an adequate due diligence with respect to the Merger with Health Net, by issuing a materially false and misleading Joint Proxy and other SEC filings, and by permitting Centene to overpay for Health Net stock in the Merger.

**B.      Defendants Roberts and Eppinger as Audit Committee Members Are Not Disinterested as They Face A Substantial Likelihood of Liability**

179.    Defendants Roberts and Eppinger, as members of the Audit Committee, are also disqualified from considering demand due to their complicity in the misconduct described herein and their failure to uphold their fiduciary duties as described herein. The Audit Committee's Charter and the members of the Audit Committee, at all relevant times, were and are responsible

for reviewing the Company's financial reports, the Company's business and financial risk management practices, the Company's legal and regulatory compliance, and reviewing the integrity of the Company's financial statements and internal controls. Notably, in performing these duties, Defendants Roberts and Eppinger were required to discuss with management and the Company's independent auditor the annual financial statements, including the disclosures in management's discussion and analysis.

180.     Defendants Roberts and Eppinger were required to discuss with management and the Company's independent auditor filings with the SEC before they were filed. Defendants Roberts and Eppinger also were required to discuss with management the major financial risk exposures regarding the Merger with Health Net which would include its California and Arizona policies, substance abuse treatment center claims, potential tax liabilities and compliance with federal Medicare and Medicaid requirements.  Defendants Roberts and Eppinger breached their fiduciary duties by allowing Centene to merge with Health Net at an inflated price and to make misleading statements in the Joint Proxy and other SEC filings.  Defendants Roberts and Eppinger each face a substantial likelihood of liability for their breaches of fiduciary duties, and, therefore, any demand upon them is futile.

181.     Defendants Roberts and Eppinger, as members of the Audit Committee, reviewed and approved the misleading statements. Defendants Roberts and Eppinger also knew prior to the Merger of the financial problems at Health Net as a result of their presence at Audit Committee meetings.  The Audit Committee's Charter provides that it is required to review the Company's earnings release, financial information, and quarterly financial statements.  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the misleading statements related to Centene's earnings guidance, Health Net's violations and financial and

disclosure controls.  Defendants Roberts and Eppinger were also responsible for ensuring that Centene's financial statements complied with GAAP and SEC requirements.  Because Centene's and/or Health Net's financial statements violated GAAP, Defendants Roberts and Eppinger are not disinterested for purposes of considering demand.

### C.      Additional Allegations of Demand Futility

182.    It is clear that a pre-suit demand on the Centene Board of Directors would be a futile and useless act for the following reasons:

(a)      Centene's Proxy Statement filed with the SEC on March 10, 2017 expressly states that Defendant Neidorff is not independent according to New York Stock Exchange ("NYSE") rules;

(b)      The public statements by Health Net regarding its own dramatic claims increases in California; the extensive due diligence Centene's Directors conducted before the Merger regarding Health Net's business; the Board's unanimous approval of the Merger and execution and filing of the Joint Proxy; the Board's knowledge of the regulatory scrutiny of the Merger; management's regular updates to the Board regarding Centene's implementation and integration with Health Net; the key financial figures provided to the Board showing that Health Net's assets and liabilities were not as reported in the Joint Proxy that they had executed and filed with the SEC; their continuing failure to correct the information purported to support their unanimous approval of the Merger and provided to stockholders in the joint proxy; the Board's review, authorization and filing of the Company's later financial statements that continued to misstate Health Net's financials and that became the  subject of a securities class action against the Company; and the

active personal participation by the Director Defendants of the misconduct alleged herein, and are breaches of fiduciary duty that disqualify them from impartially considering demand;

(c)     Director Defendants Eppinger and Roberts, as members of the Audit Committee, are also disqualified from considering demand due to their complicity in the misconduct described herein and their failure to uphold their fiduciary duties, as described in the Audit Committee Charter, to review the Company's audited financial statements and other financial reporting and ensure that the Board provides sufficient internal control over financial reporting;

(d)     In addition, the sales and dispositions of personal stock holdings by Neidorff and Gephardt, while in possession of material adverse information, gives rise to a breach of duty of loyalty for insider sales and makes demand on them futile.

183.   The Director Defendants have also each violated Centene's Code of Conduct by: (i) unanimously approving the terms of the Merger and soliciting stockholder votes for the Merger without disclosing the true nature of Health Net's financial condition; (ii) failing to cause Centene to comply with all applicable laws and regulations, including the federal securities laws; (iii) failing to maintain internal controls, corporate governance and compliance procedures; and (iv) failing to cause Centene to appropriately maintain the Company's financial statements and accurately report its financial performance on filings made with the SEC.

184.   The Director Defendants have demonstrated a longstanding unwillingness or inability to act to uphold their fiduciary obligations to the detriment of the Company, and will not sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein, of which there is a substantial likelihood of liability. The

Director Defendants have longstanding relationships with each other, and therefore are not able to and will not vigorously prosecute any such action.

185.    The Director Defendants participated in and approved the wrongdoing described herein and participated in efforts to conceal or disguise those wrongs from Centene's stockholders and are therefore not disinterested parties. ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████    Pursuant to their specific duties as Board members, the Director Defendants are charged with oversight of the Company and its compliance with the law. The Director Defendants breached the fiduciary duties of loyalty they owed to Centene and its stockholders in that they failed to prevent and correct known securities fraud violations and false financial reporting, and acquiesced to Defendant Neidorff in allowing the Company to carry out a stockholder solicitation for the Merger based on false pretenses and incomplete financial information, thereby incentivizing continued noncompliance. Thus, each Director Defendant is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action.

186.    The Director Defendants have benefitted, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their longstanding positions of control and the perquisites derived therefrom and have failed to timely institute reforms that would allow accurate financial reporting.  The Director Defendants are thus incapable of exercising independent judgment in deciding whether to commence and vigorously prosecute this action.

187.    Centene has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the current Board has not filed any lawsuits against itself or others who were responsible for that wrongful conduct to attempt to recover for Centene any part of the damages Centene suffered and will suffer thereby.

188.    Defendants Neidorff and Schwaneke are defendants in the Securities Action.  The Director Defendants reviewed the due diligence and other information forming the basis of the incomplete or inaccurate financial disclosures complained of in the Securities Action and herein, and as such are similarly situated to these defendants. The participation of Defendants Neidorff and Schwaneke in the alleged securities fraud and their admissions of Centene's knowledge of Health Net's problems prior to the Merger, therefore disqualifies them and the Director Defendants from independently considering demand.

189.    In order to bring this action for breaching their fiduciary duties, the Director Defendants would have been required to sue themselves and/or their fellow directors and executives in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, personal and business interests and other dependencies, which they would not do.

## XI.    DAMAGES TO CENTENE

190.    The Defendants breached their duties of loyalty and good faith by: (i) unanimously approving of the Merger and execution and filing of the Joint Proxy, disregarding public statements by Health Net regarding its own dramatic claims increases in California and the extensive due diligence the Board conducted before the Merger regarding Health Net business; and (ii) authorizing the Company's filing of materially false and misleading Joint Proxy and other SEC filings that included false financial statements that failed to disclose the true nature of the schemes

herein described.  As a result of these breaches, Centene has incurred significant expenses, and will continue to expend significant sums, including:

(a)     The amount of the premium Centene paid over the actual value of Health Net's business in connection with the Merger, due to the Director Defendants' failure to carry out their fiduciary duties to the Company;

(b)     Damages to the Company in the form of an increase to Health Net substance abuse treatment cost reserves by $90 million as well as recording a $300 million premium deficiency reserve for its business in Arizona, California, and Oregon, which was known to the Individual Defendants before entry into the Merger, in addition to any other costs incurred as a result of delaying payment to substance abuse treatment facilities;

(c)     Costs incurred to carry out internal investigations, including the costs of legal and other fees paid to outside counsel, auditors, and other experts, and including the costs paid to Allen & Co. and Evercore in connection with the Merger, to render worthless opinions based on Company-adjusted financial information at the direction of the Individual Defendants;

(d)     Resultant loss of business and business opportunities;

(e)     Loss in market value and stockholder equity;

(f)     Legal fees, costs, and amounts payable in settlement or satisfaction of the Securities Action brought against the Company related to the foregoing wrongdoing;

(g)     The increased capital costs the Company will incur as a result of loss of market capitalization and the Company's damaged reputation in the investing community as a result of the foregoing;

(h)     Costs related to the California state tax liability of nearly $1 billion and future costs related to the imposition of a 2.35% tax going forward on premiums for policies sold in California; and

(i)     Costs related to the DOJ investigation of fraudulent claims including Health Net's response to the CIDs and potential loss of government contracts or business.

191.     As the Securities Action alleges, because Centene accounted for $300 million of the $390 million in increased liabilities in its second quarter 2016 financial statements using purchase accounting rules (in violation of GAAP), there was no impact on Centene's income statement.  However, Centene executives admitted that, without the Company's use of purchase accounting rules regarding the material PDR changes, Centene's quarterly pre-tax earnings would have been reduced by $300 million (84%), severely impacting the earnings per share metric that the Company reported to analysts and investors.  As a result, on July 26, 2016, the price of Centene common stock declined by $6.39 per share, approximately 8.5%, erasing over $1 billion of stockholder value on high trading volume.

192.     Centene has been directly and substantially injured by reason of the Individual Defendants' intentional breach and/or reckless disregard of their fiduciary duties of loyalty to the Company. Plaintiffs, as stockholders and representatives of Centene, seek damages and other relief for the Company, in an amount to be proven at trial.

## XII.   CLAIMS FOR RELIEF

### CLAIM I
### Violation of Section 14(a) of the Exchange Act
### Against the Proxy Defendants

193.     Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

194.     The Proxy Defendants negligently issued, caused to be issued, and participated in the issuance of materially false and misleading statements to stockholders which were contained in the Joint Proxy.  The Proxy Defendants, reviewed, and signed the Joint Proxy.  The Joint Proxy contained a proposal for issuance of the common stock necessary to effectuate the Merger.  In seeking stockholder approval of this proposal, the Joint Proxy contained the numerous materially misleading statements described above concerning Health Net's (and Centene's) business activities, operations, finances, and prospects.

195.     In addition to the false and misleading statements in the Joint Proxy itself, the Joint Proxy incorporated by reference Health Net's Form 10-K Annual Reports for each year of the five-year period ended December 31, 2014, and Health Net's Form 10-Q Quarterly Report for the quarter ended June 30, 2015 into the Joint Proxy.  This incorporation was further misleading in that it failed to disclose the material trends and uncertainties that made Health Net's California and Arizona businesses less profitable, failed to disclose the increasing liabilities Health Net incurred on those plans and its refusal to pay to substance abuse facilities, and the serious risk from the massive tax liabilities.  The Proxy Defendants' failure to provide full and accurate disclosure alter the "total mix" of information provided in the Joint Proxy.

196.     By reason of the conduct alleged herein, the Proxy Defendants violated Section 14(a) of the Exchange Act.  As a direct and proximate result of the Proxy Defendants' wrongful conduct, the Joint Proxy misled and/or deceived Centene's stockholders, who voted in favor of the stock issuance which made the Merger possible.

197.     The misleading information contained in the Proxy was material to the Company's stockholders in determining whether to approve the Merger in that a reasonable stockholder would

consider them important in deciding how to vote.  The proxy solicitation process in connection with the Joint Proxy was an essential link in the stock issuance's ratification.

198.    Plaintiffs, on behalf of Centene, seek relief for the damages inflicted upon the Company based on the misleading Joint Proxy in connection with the improper approval of the Merger.

### CLAIM II
### Breach of Fiduciary Duty
### Against All Defendants

199.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

200.    The Defendants had and have fiduciary duties to Centene.  By reason of their fiduciary relationships, the Defendants owed and owe Centene the highest obligation of good faith, fair dealing, loyalty, and due care.

201.    The Defendants and each of them violated and breached their fiduciary duties by allowing Centene to merge with Health Net based on an inadequate due diligence, a materially false and misleading Joint Proxy, by allowing Centene to issue materially false and misleading information concerning its business and Health Net's finances.

202.    As a direct and proximate result of the Defendants' breaches of their fiduciary obligations, Centene has suffered damages, as alleged herein.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

203.    Plaintiffs, on behalf of Centene, have no adequate remedy at law.

**CLAIM III**
**Derivative Claim for Breach of Fiduciary Duty of Loyalty,**
**Good Faith and Candor in Connection with**
**The Federal Securities Law Violations**

204.    Plaintiffs incorporate by reference and realleges each and every allegation contained above as though fully set forth herein.

205.    The Defendants owed and owe the Company a duty to disclose material information in their possession concerning the Company's business and operations in all public filings and statements to stockholders and the public.

206.    The Defendants violated and breached their duty of loyalty, good faith and candor by concealing the problems and risks concerning Health Net's business and by issuing false and misleading financial statements in violation of GAAP and false and misleading SEC filings.

207.    As a direct and proximate result of Defendants' breach of their duty of loyalty, good faith and candor, Centene violated its disclosure obligations under the Securities Act of 1933 and the Securities Exchange Act of 1934 and has sustained significant damages.  As a result of the misconduct alleged herein, the Defendants are liable to the Company.

**CLAIM IV**
**Derivative Brophy Claim for Insider Trading**
**Against Selling Defendants**

208.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

209.    The Selling Defendants owed and owe fiduciary duties to the Company to disclose material information to the Company's shareholders and to refrain from using non-public material information in connection with trading their personal holdings of Centene stock.

210.    The Selling Defendants knew and understood but concealed the material facts described herein that: (1) Health Net's California and Arizona policies were unprofitable; (2) that

Health Net and Centene had decided to exit the Arizona business; (3) that Health Net was exposed to a massive tax liability, and (4) that Health Net was involved in a scheme to defraud Medicaid and Medicare.

211.    This information was proprietary non-public information concerning Centene and Health Net's business, financial condition and regulatory issues.  It was proprietary information belonging to Centene, which the Selling Defendants used for their own benefit when they sold or otherwise disposed of Centene stock during the relevant period.

212.    Because use of the Company's proprietary information for their own gain constitutes a breach of the Selling Defendants' duties of loyalty and good faith, the Company is entitled to damages and to the imposition of a constructive trust on any profits they obtained thereby.

**CLAIM V**
**Unjust Enrichment**
**Against All Individual Defendants**

213.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

214.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Centene.  The Defendants were unjustly enriched as a result of the compensation and remuneration they received while breaching fiduciary duties owed to Centene and through their sale or disposition of Company stock at artificially inflated prices.

215.    The Selling Defendants were unjustly enriched by reason of their sales or disposition of Centene stock while in possession of material nonpublic information.

216.    Plaintiffs, as stockholders and representatives of Centene, seek restitution from the Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and

other compensation obtained by the Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

217.    Plaintiffs, on behalf of Centene, have no adequate remedy at law.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Declaring that Plaintiffs may maintain this derivative action on behalf of Centene and that Plaintiffs are proper and adequate representatives of the Company;

B.    Declaring that the Defendants have breached their fiduciary duties of loyalty, due care and candor to Centene and Centene's stockholders;

C.    Determining that the Defendants have violated Section 14(a) of the Exchange Act by issuing a materially false and misleading proxy statement (the Joint Proxy);

D.    Determining and awarding to Centene the damages sustained by it, as a result of the dissemination of a materially false and misleading Joint Proxy statement, the breaches of fiduciary duty and other claims set forth above from each of the Defendants, jointly and severally;

E.    Directing Centene to take all necessary actions to reform and improve its corporate governance and internal procedures, to enable the Company to comply with the Company's existing governance obligations and all applicable laws, and to protect the Company and its stockholders from a recurrence of the damaging events described herein, including but not limited to the following specific relief:

(i)    Requiring the Company to put forward for stockholder vote resolutions for amendments to the Company's Bylaws and/or Articles of Incorporation allowing for increased stockholder proxy access, eliminating the Company's staggered Board structure, and increasing the number of Board members; and

(ii)      Requiring the Company to implement additional audit, compliance, and internal control procedures;

F.      Determining that the Seller Defendants have sold shares of Centene stock while in possession of material nonpublic information and awarding Centene damages for their insider sales;

G.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

H.      Awarding pre- and post-judgment interest; and

I.      Granting such other and further relief as the Court deems just and equitable.

## XIV.  JURY DEMAND

Plaintiffs demand a trial by jury.

Dated:  December 14, 2018                    Respectfully submitted,

                                             */s/ Jamie L. Reyes-Jones*
                                             Jamie L. Reyes-Jones, Bar No.: 19734
                                             Hartnett Gladney Hetterman, L.L.C.
                                             4399 Laclede Avenue
                                             St. Louis, Missouri 63108
                                             (314) 396-6476
                                             jjones@hghllc.net

                                             Carol V. Gilden
                                             **Cohen Milstein Sellers & Toll PLLC**
                                             190 South LaSalle Street, Suite 1705
                                             Chicago, IL 60603
                                             (312) 357-0370
                                             cgilden@cohenmilstein.com

                                             Richard A. Speirs
                                             **Cohen Milstein Sellers & Toll PLLC**
                                             88 Pine Street, 14th Floor
                                             New York, NY 10007
                                             Chicago, IL 60603
                                             (212) 838-7797
                                             rspeirs@cohenmilstein.com

                                             Eric S. Berelovich
                                             **Cohen Milstein Sellers & Toll PLLC**
                                             1100 New York Avenue, N.W. / Fifth Floor
                                             Washington, D.C. 20005
                                             (202) 408-3640
                                             eberelovich@cohenmilstein.com

                                             *Attorneys for Plaintiffs*

## VERIFICATION OF DAVID BRATEK ON BEHALF OF
## CARPENTERS PENSION FUND OF ILLINOIS

I, David Bratek, Administrator of the Carpenters Pension Fund of Illinois ("Illinois Carpenters"),

make this Declaration on behalf of Illinois Carpenters, and, being duly sworn, depose and say:

Illinois Carpenters is a derivative plaintiff in this action. I verify that I have reviewed the Verified

Shareholder Derivative Complaint (the "Complaint") to be filed in this action and that the facts stated in

the Complaint, as they concern Illinois Carpenters, are true to my personal knowledge. I believe the facts

pleaded in the Compliant on information and belief or investigation of counsel are true.

Illinois Carpenters has not received, been promised, or offered, and will not accept, any form of

compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this

action except (i) such fees, costs or other payments as the Court expressly approves to be paid to Illinois

Carpenters, or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures

incurred directly in connection with the prosecution of this action.

Dated: _12 - 12 - 2018_

_____
David Bratek
Administrator
Carpenters Pension Fund of Illinois

Sworn to and subscribed to before me this _12_ day of _December_ 2018.

_____
NOTARY PUBLIC

My commission expires:

_10.13.21_

KIM PLESHA
Official Seal
Notary Public – State of Illinois
My Commission Expires Oct. 13. 2021

## VERIFICATION OF WILLIAM A. KOLFENBACH JR. ON
## BEHALF OF IRON WORKERS LOCAL #11 PENSION FUND

I, William A. Kolfenbach Jr., Executive Director of the Iron Workers Local #11 Pension Fund ("Iron Workers"), make this Declaration on behalf of Iron Workers, and, being duly sworn, depose and say:

Iron Workers is a derivative plaintiff in this action. I verify that I have reviewed the Verified Shareholder Derivative Complaint (the "Complaint") to be filed in this action and that the facts stated in the Complaint, as they concern Iron Workers, are true to my personal knowledge. I believe the facts pleaded in the Compliant on information and belief or investigation of counsel are true.

Iron Workers has not received, been promised, or offered, and will not accept, any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except (i) such fees, costs or other payments as the Court expressly approves to be paid to Iron Workers, or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

Dated: 12/11/2018

William A. Kolfenbach Jr.
Executive Director
Iron Workers Local #11 Pension Fund

Sworn to and subscribed to before me this 11th day of December 2018.

NOTARY PUBLIC

My commission expires:
4/10/2020

BEATRIZ VENTURA
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 4/10/2020

2421564 v1